OPINION OF THE COURT
Edward J. Greenfield, J.
The smoke has not yet cleared from the debacle of shattered hopes, lives and dreams caused by the notorious activities of Michael Milken and Dennis Levine, among others, which rocked the financial world at the end of the 1980’s.
Milken and Levine have served time for their convictions of felonies and have been fined substantial sums. Their company, the investment brokerage house of Drexel Burnham Lambert, itself ultimately pleaded guilty to mail and securities fraud for its part in the crimes on September 1, 1989 and agreed to pay $650 million in criminal and civil penalties. It also settled a complaint filed against it by the Securities and Exchange Commission (SEC).
On February 13, 1990 the Drexel Burnham Lambert Group, the holding company for Drexel Burnham Lambert Incorporated (hereinafter collectively designated Drexel), filed a petition for reorganization under chapter 11 of the Bankruptcy Code (11 USC § 1101 et seq.), and thereafter the subsidiaries likewise filed chapter 11 petitions. There was a veritable deluge of civil suits and claims in the bankruptcy proceedings which were filed against Drexel and Milken, aggregating well over $25 billion, including suits by the Federal Deposit Insurance Corp. (FDIC) and the Resolution Trust Corp. (RTC) for $6.8 billion on behalf of failed savings and loan associations that sustained heavy losses in the high yield bond market as a *202 result of the conduct of Drexel and its employees. A potential settlement of these claims has been worked out in the United States District Court for the Southern District of New York, contingent on the recovery of substantial sums by Drexel on its fidelity bonds and other insurance.
Drexel, as debtor-in-possession, commenced this lawsuit in the New York Supreme Court and after an attempt was made to remove it to the Federal court, Drexel moved to have it remanded, and on August 5, 1991 Hon. David Edelstein remanded the case to this court. On September 24, 1991, Drexel served its complaint, claiming against 39 named defendants on 51 bonds covering losses sustained through employee fraud and dishonesty which bonds were issued during the years 1986-1990.
One group of insurers, Vigilant, Federal and Pacific (the Chubb defendants), moved to dismiss the complaint pursuant to CPLR 3211 (a), or alternatively to correct the vague and ambiguous pleading under CPLR 3024. The other defendants all joined in motions seeking dismissal, all of which have been redesignated as cross motions and consolidated for disposition.
THE COMPLAINT
The complaint alleges that by reason of the dishonest activities of Levine, Milken and others, criminal and civil claims were made against Drexel, as a result of which Drexel sustained and is continuing to sustain losses covered under the employee dishonesty coverage provisions of its insurance policies for 1986-1990.
Drexel alleges that on June 26, 1990, it filed an interim proof of loss, supplemented thereafter, detailing over $1 billion that it has already paid in settlement of Federal, State, and private claims, together with millions of dollars in attorneys’ fees, litigation support costs, and public relations, advertising and consulting costs. It is further alleged that the defendants rejected the interim proof of loss and have refused to indemnify Drexel. Further, Drexel contends that it may sustain hundreds of millions of dollars in additional losses presently unliquidated.
Eight causes of action are set forth in the complaint. The first two seek a declaratory judgment that inasmuch as Drexel does not yet know the full scope of losses presently unliquidated and its potential liability in claims against it (a) there should be a declaration that it is not required to file a proof of *203 loss until six months after all claims premised on the dishonesty of Levine, Milken and others have been concluded, (b) is not required to sue until two years after the filing of its chapter 11 petition or the settlement agreement in Federal court is concluded; and (c) this action, although commenced by Drexel (ostensibly to safeguard its rights) should be stayed in whole or in part. The third cause of action seeks a declaratory judgment that both its existing and its undetermined and unliquidated losses are covered under one or more of the policies sued on.
The fourth cause of action alleges breach of contractual obligations resulting in unspecified damages on the 1986 policies, the fifth cause of action on the 1987 policies, the seventh cause of action on the 1989 policies, and the eighth cause of action on the 1990 policies.
CLAIMS AGAINST BROKERS AND MANAGERS
Five of the defendants[1] seek dismissal under CPLR 3211 (a) (1) on the grounds that documentary evidence demonstrates that each of them are not carriers but brokers, managers or agents for disclosed principals (i.e., other defendants) and as such agents they are subject to no liability under any of the policies. (W. C. Humphreys, Inc. v Zurich Ins. Co., 54 Misc 2d 659; see also, Penick v Frank E. Basil Inc., 579 F Supp 160; Seguros Banvenez v S/S Oliver Drescher, 761 F2d 855; People v Ocean Club, 602 F Supp 489; Janina Travel Bur. v Kalison, 72 AD2d 916.) There is no indication any of them was to be personally bound.
Indeed, 100% participation on all the policies is accounted for by the shares of other defendants eliminating any ambiguities and thereby confirming the agency relationship as reflected in their signatures preceded by the word "per” (see, Restatement [Second] of Agency § 156, comment a). There is no need for discovery. As to these five defendants, the complaint in its entirety must be dismissed. There is absolutely no basis for their inclusion in this lawsuit.
DECLARATORY AND INJUNCTIVE RELIEF
A declaratory judgment may be warranted under CPLR *204 3001 if it becomes necessary to declare the rights and legal relations of the parties as to a justiciable controversy. It is designated to clarify present or prospective obligations, to resolve uncertainty as to a course of action to be taken. The objective is primarily to still speculation as to an appropriate course of future conduct, without incurring the penalties of a present misstep. Declaratory relief is not necessary when the claim is fully subsumed in an action for breach of contract, and the declaration would add nothing and serve no useful purpose. (James v Alderton Dock Yards, 256 NY 298; Apple Records v Capitol Records, 137 AD2d 50, 54; Young & Co. v Fleischman, 85 AD2d 571.) Although plaintiff seeks a declaration that no proof of loss is yet required, it has already filed what it characterizes as an interim proof of loss under the 1986, 1987, 1988, 1989 and 1990 policies listing, among its losses, the amounts it paid in settlement of the government’s charges against it, the attorneys’ fees and expenses it incurred, and losses incurred in the settlement of other civil claims aggregating well over a billion dollars. These are well in excess of the total coverage in any given year. There is no need to declare, such proofs of loss having already been filed, that the deferral of filing of proofs for the purpose of permitting quantification of further contingent liabilities will serve any real or practical purpose. When the basic loss claimed has been identified, supplemental proofs clarifying the sums claimed can be submitted, but a request for a declaratory judgment that further proofs can be submitted cannot serve as a device for leaving a claim open-ended, so that if some aspects are ruled out, newly "discovered” claims can be rushed in as substitutes.
Since plaintiffs contend that the defendant insurers have breached their contractual obligations to make good the losses, the causes of action for breach of the policies provide an adequate remedy at law, obviating the necessity for any declaration as to coverage. (Balkan Demolition Co. v Yorkshire Ins. Co., 3 AD2d 902; Elmsford Props. Corp. v Daitch Crystal Dairies, 13 AD2d 1026; Automated Ticket Sys. v Quinn, 90 AD2d 738.)
THE BONDS
The contracts of insurance which are sued on herein are commonly known in the trade as "bankers and brokers blanket bonds”. There are 51 separate bonds sued on herein, *205 issued by 39 different insurers. While similar in their essential nature, they cover different policy years, define their coverages differently, specify varying exclusions, and the consequences of the discovery of a loss.
The bonds are not liability policies. They do not purport to provide coverage for claims third parties may make against Drexel, nor do they provide for any duty to defend against such claims or to indemnify for sums paid out. The insuring company is declared not to be liable for loss sustained by anyone other than the assured.
The typical bond (i.e., Vigilant 1986) provides that it covers, among other things, losses sustained by reason of the dishonesty of employees or partners committed "for the purpose of making an improper personal financial gain”, whether alone or in collusion with others.
Explicitly excluded from coverage by the specified exclusions are (a) losses resulting from the purchase or sale of securities; (b) losses resulting from the violation by the assured or by any employee of the Securities and Exchange Act and other Federal, State and municipal statutes or regulations; and (c) any exemplary, punitive or consequential damages for which the assured is legally liable. Other bonds, such as that of National Union Fire Ins. Co., explicitly exclude "consequential loss, including but not limited to any responsibility to customers or others” as well as "failure to realize potential gains” or "disclosure of confidential information”.
The assured is required to give notice "at the earliest practicable moment after discovery of any loss hereunder, or of any occurrence or act which may give rise to a claim for loss even though no loss is then sustained, but in no event more than 30 days after such discovery”.
The bond and coverage thereunder terminates as to any partner or employee of the assured when any supervisory employee not in collusion "shall learn of any dishonest act on the part of such General Partner or Employee”.
The coverage afforded under each bond is for losses discovered within the policy period, regardless of when the dishonest acts or the losses may have occurred. Once the policy period expires, coverage under the bond covering for the next successive year, and the new bond is at risk for all dishonest acts and losses discovered during its term no matter when they took place.
For the calendar year 1986, Vigilant Insurance and Na *206 tional Union provided the primary layer of coverage, with Lloyds, Aetna, INA, Continental and Home providing excess layers, for total coverage of $140 million.
In 1987, Vigilant dropped out, and Drexel was self-insured for $22.5 million, while National Union, Lloyds, Reliance and INA covered for $45 million.
From January to November 1988, National Union, Lloyds, Reliance, INA and Gulf provided $65 million in insurance, while Drexel was self-insured for $25 million.
From November 30, 1988 to November 30, 1989, Lloyds, National Union, Pacific, Gulf and Reliance covered for $100 million.
From November 30, 1989 to November 30, 1990, there was again $100 million in coverage provided by Lloyds, National Union, Reliance, Federal and Pacific.
Plaintiff Drexel claims the right to be indemnified for losses as the result of dishonest acts committed by its employees, including the settlement of claims brought against it under each of the policies covering the years 1986, 1987, 1988, 1989 and 1990 for sums far in excess of the specified coverages. While the exact terms of each bond or policy on which claims are made vary from one to the other, little would be gained by analyzing and differentiating among each of the 51 bonds, for they are sufficiently similar, and the principles to be applied in determining whether there is an arguable right to recovery thereunder are over-arching and universally determinative.
DISCOVERY
The complaint seeks recovery for losses occasioned by the acts of Dennis Levine, Michael Milken and others. Levine was a managing director of Drexel in its corporate finance department, specializing in mergers, acquisitions and leveraged buyouts. It is alleged that in 1985 Levine provided Ivan Boesky, a non-Drexel employee, with insider information which "he stole from Drexel”, and shared in trades with Boesky, realizing at least $11.5 million in profits. Note that what Levine is alleged to have stolen is not money or securities, but "information” contrary to securities laws and regulations, depriving Drexel of a potential profit for itself.
Levine was indicted in 1986 for securities fraud and other crimes to which he pleaded guilty, and he also settled charges against him brought by the SEC, agreeing to disgorge his gains. Drexel notified the insurers on September 4, 1986 that *207 Levine had been charged with insider trading and had pleaded guilty to the criminal charges and had settled with the SEC in June, and that as a result claims by third parties against Drexel might thereafter be asserted.
The complaint further alleges that Boesky also pleaded guilty and settled charges of securities fraud, implicating Michael Milken, the head of Drexel’s high yield bond division. Michael Milken and other Drexel employees (Lowell Milken, Cary Maultasch, Bruce Newberg, Martin Siegel and Pamela Mouzert) were charged with securities fraud involving the shares of numerous companies from 1984 to 1986 including insider trading, stock parking and manipulation. Milken pleaded guilty in 1990 to six felony counts including conspiracy, securities fraud and mail fraud, agreed to pay $200 million in fines and penalties, and $400 million to defray claims against him.
As a result, Drexel, which was also charged with criminal responsibility, pleaded guilty to six counts, agreed to pay fines and penalties of $300 million, and to set up a disgorgement fund of another $350 million to help pay the claims of outsiders who claimed to have been damaged. Milken had allegedly received a percentage of the fees realized by Drexel for these suspect transactions, and obtained enormous profits by diverting "opportunities” which should have accrued to Drexel. Drexel allegedly has claims against it in which billions of dollars in damages are sought.
It is manifestly clear that under bonds providing coverage for losses discovered during their term, the discovery that a particular employee has been dishonest can be made only once. If the activities of Levine came to light in 1986, as the complaint alleges, there is no conceivable basis upon which claims can also be made arising out of his activities for subsequent years. Similarly, if Milken’s manipulations became known in broad outline by 1987, claims on policies covering for the years thereafter are precluded.
Although the complaint very artfully seeks to avoid any statement as to when particular losses were discovered, plaintiff contends that it can plead in the alternative that discovery took place in 1986 or 1987 or 1988 or 1989 or 1990. Not so. CPLR 3013 requires particularity in pleadings. CPLR 3014 and CPLR 3017 permit a plaintiff to request relief in the alternative, but the occurrence of a fact such as a date must be set forth with specificity. Theories as to the basis for legal *208 recovery may be inconsistent, but not facts. It cannot be alleged that maybe a fact occurred or maybe it didn’t. (See, 21 Couch, Insurance 2d, at 257 [1986 rev ed]; 805 Third Ave. Co. v M. W. Realty Assocs., 58 NY2d 447, 453.) The fact of discovery, which had to be known to plaintiff, had to occur in a given year. Discovery is not a gradual awakening of consciousness. It did or it did not occur. It does not take years for the dawn to break. Before discovery there is, presumably, blissful ignorance, but once that ignorance, that lack of knowledge is dispelled, then, like virginity, it is gone forever.
It is no argument that at dates subsequent to the initial revelation a clearer picture emerges, and more details become known. What difference if claims predicated on the dishonesty materialize (as in a liability suit) or become liquidated in amount at a later time? A loss is discovered once an insured has obtained facts sufficient to cause a reasonable person to recognize that there has been dishonesty or fraud resulting in loss. (Utica Mut. Ins. Co. v Fireman’s Fund Ins. Co., 748 F2d 118, 121-122.) The insured is required to give notice of the discovery of a loss or of an occurrence or act which may give rise to a claim for loss even though no loss is then sustained. The particulars can come later with the proof of loss, time for the filing of which may be (and here was) extended. Counsel for Drexel conceded on oral argument that "the loss was discovered in 1986”. "1986 is when it became apparent that claims would fall within the coverage of the bond.” Under the circumstances, no matter what claims for liabilities may have been asserted against Drexel thereafter, no additional coverage would come into play based upon the dishonesty of Milken, Levine and the other employees named or who acted in collusion with them for the bonds in effect after 1986. "The event triggering an insured’s obligation under the policy with respect to proof of loss is 'discovery’ not 'determination’ of the loss.” (Commodore Intl. v National Union Fire Ins. Co., 184 AD2d 19, 21-22 [1st Dept 1992].) It would be inconceivable for any rational insurer to assume coverage from a predecessor insurer for dishonesty previously discovered but not yet delineated. All the primary bonds provide that upon discovery of any dishonest act, further coverage is terminated as to that employee. Once discovery takes place, the time to give notice and to file proofs of loss starts to run. It is an unwarranted imposition on those defendant insurers whose policies cannot be deemed to cover for Milken, Levine and associates to compel them to appear and defend, and possibly endure years *209 of extensive and expensive pretrial discovery when even their potential liability cannot be demonstrated. (See, Schwartzman v Wertz, 153 Misc 2d 187, affd 179 AD2d 540.) The bonds in effect at the date of discovery may be implicated, but all other bonds are exonerated.
COVERAGE
Drexel is faced with considerable difficulties in asserting a valid claim under the 1986 bonds, not the least of which are the problems raised by the coverage and exclusion provisions. It is contemplated that the dishonesty insured against is the taking of property for improper personal gain. This case is unique, for while Milken, Levine, et al., were engaged in dishonest acts, their frauds were not committed against Drexel, but against members of the investing public, the companies they manipulated, and the Federal regulatory agencies. In short, they did not steal from the company, they stole for the company.
The insurance policies here involved are fidelity blanket bonds, not liability insurance policies. They do not purport to defend and indemnify the assured every time a claim is made against it because it may be responsible to others for the acts of its employees.[2] The loss covered is the loss to the insured, not the losses sustained by the outside world. Hence, the exclusions for "consequential damages.” Further excluded are losses resulting from trading and the purchase and sale of securities and from violations of security laws and regulations. That is the very heart of plaintiff’s claim. The acts of dishonesty include stock manipulation, stock parking, insider trading and other trading and securities violations, both garden variety and exotic. There is no coverage provided for lost profits or for "loss of potential income”, though Drexel persists in alleging it was deprived of "opportunities”. The complaint alleges Levine and Milken stole not assets but confidential information to amass their profits, but losses arising from "theft of confidential information” are expressly excluded. Abuse of the use of confidential information is not the equivalent of monetary theft. Drexel also seeks to recover for the fines and penalties it paid, but expressly excluded are claims by the insured to recover exemplary and punitive damages. It is plain that many categories comprehended in plaintiff’s *210 claim, although not clearly designated, are either not covered or expressly excluded.
COLLATERAL ESTOPPEL
If the claims of dishonest or criminal conduct by an employee also involve the criminal conduct of the insured, it is the contention of the defendant insurers that a guilty insured cannot claim that it has been the victim of dishonest acts in which it knowingly participated. Therefore, in view of the fact that the insured, Drexel Burnham, had in fact pleaded guilty to criminal charges in the Federal court on September 11, 1989, involving six major groups of transactions which are at the heart of this case, defendants urge that Drexel is collaterally estopped from pursuing these insurance claims. It is argued that since Drexel has, by its plea, admitted that it willfully and knowingly participated and benefitted from the criminal conduct engaged in by Milken, Levine and the others on its staff, that they are barred from seeking recovery as an innocent and injured party. Apart from the policy provisions and exclusions themselves, the argument is made that public policy must prohibit indemnification for a party which has itself violated the law and has been guilty of criminal conduct.
Collateral estoppel, or issue preclusion, will be granted when the identical issue has necessarily been decided in a prior proceeding and there has been a full and fair opportunity to be heard. (D’Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659.) An issue decided in a criminal proceeding may be given preclusive effect in a subsequent civil action. (Gilberg v Barbieri, 53 NY2d 285; Vavolizza v Krieger, 33 NY2d 351; S. T. Grand Inc. v City of New York, 32 NY2d 300.) For the purposes of collateral estoppel, a guilty plea is the equivalent of a conviction after trial. (Merchants Mut. Ins. Co. v Arzillo, 98 AD2d 495; Grayes v DiStasio, 166 AD2d 261; Hooks v Middlebrooks, 99 AD2d 663.) Further, it is a judicial admission of complicity.
The criminal information against Drexel filed in the United States District Court for the Southern District of New York on January 24, 1989, focused on the activities of its high yield and convertible bond department in Beverly Hills. Drexel was charged with engaging in secret arrangements with Ivan Boesky "for the benefit of the defendant Drexel” and that defendant Drexel, through its employees in the high yield department manipulated securities prices to obtain unlawful *211 trade profits. It was charged that Boesky agreed to pay Drexel a percentage of any realized profits and that Drexel received a direct payment of $5.3 million from the Boesky organization. In connection with the sale of securities in Fischbach Corporation, it was charged that Drexel fraudulently failed to file the appropriate schedules and received $3 million for its services. Drexel was also charged with acting illegally with Boesky with respect to Harris Graphics Corporation, as a result of which Drexel received $4 million for raising money to repay bank loans incurred to take over Harris Graphics and further received $5.6 million in trading profits. Drexel was also charged with receiving $5.9 million for its financing services in the manipulation of the shares of Stone Container Corporation. Drexel agreed to plead guilty to the information and to pay the sum of $650 million, $300 million of which was for civil and criminal penalties payable to the United States and $350 million as a disgorgement fee to compensate civil claimants.
Frederick H. Joseph, the president and chief executive officer of Drexel, submitted an affidavit attesting to the fact that Drexel’s board of directors had voted to ratify the plea agreement, understanding that it would involve a conviction of Drexel on six felony counts and would waive the right to a trial voluntarily and without coercion. Drexel had kept Milken on well after 1986, as head of its high yield bond department, and continued to pay him hundreds of millions of dollars. Joseph conceded that but for the plea agreement insisted upon by the government, Drexel would have had no objection to paying Milken additional compensation for 1988. On the taking of the plea on September 11, 1989, Drexel acknowledged its guilt and its awareness that penalties could be imposed for up to twice the amount of its pecuniary gain. The United States Attorney indicated that the fines imposed on Drexel were based upon "the ill gotten gain” that it achieved, and that the activities of Milken were "the principal source of Drexel’s extraordinary profitability”. Drexel acknowledged that it was in no position to dispute the government’s charges.
While it is contended that Drexel’s guilty plea merely acknowledged its vicarious liability for the criminal conduct of its employees, there is obviously much more than vicarious liability here involved. It is, of course, well established that a corporation, an artificial entity which can act only through the activities of its officers and employees, can be held directly *212 responsible for criminal conduct not the result of mistake, negligence or inadvertence (United States v Murdock, 290 US 389; United States v Dixon, 536 F2d 1388; People v Canadian Fur Trappers, 248 NY 159; People ex rel. Price v Sheffield Farms, 225 NY 25; People v Hudson Val. Constr. Co., 217 NY 172). Corporate guilt is direct and not vicarious when it can be said that the corporate conduct was willful and deliberate. Corporate conduct must be deemed willful when the employees have been carrying out corporate policy, where the top echelons of the corporation have condoned the conduct of the individuals or where the corporation has, as a result of the criminal conduct, enjoyed the benefits of the profits amassed. (United States v Gold, 743 F2d 800, cert denied 469 US 1217; United States v Richmond, 700 F2d 1183; United States v Beusch, 596 F2d 871; Rocky Riv. Dev. Co. v German Am. Brewing Co., 193 App Div 197, 201.) Milken, et al., were not working at cross-purposes with Drexel, but for their mutual benefit.
The criminal information and Drexel’s guilty plea make it clear that Drexel’s corporate responsibility for criminal conduct was not merely vicarious, and that it was not merely acknowledging that its employees had acted improperly. The information charged Drexel itself with acting willfully and intentionally. What was done clearly could not have been done without the knowledge and approval of the top officers in the corporation. Drexel admitted its crimes were willful and intentional. If its guilt was merely passive, and its responsibilities arose only by virtue of respondeat superior, it could have entered a nolo contendere plea and disclaimed actual corporate responsibility in the allocution to the plea. (Fed Rules Civ Pro rule 11.) Now, like Captain Louis Renault in the movie Casablanca, it professes to be "shocked, simply shocked” to learn what had been going on.
It is clear that until the fraud was exposed, Drexel continued to receive vast profits from the transactions in question. Having accepted the benefits of the misdeeds of its agents or employees, it essentially is estopped from denying knowledge of the facts. (Marine Midland Bank v Russo Produce Co., 50 NY2d 31, 44.) Drexel has acknowledged its own joint criminal responsibility on the record. It is hardly in a position now to complain about its losses because of the activities of the individuals who stole for the company and not from it. There are no defalcations, thefts, or embezzlements here involved. There were questionable securities transactions *213 and improprieties in financial arrangements with customers, illegal enterprises which brought it millions in profits. Drexel acknowledged that, it participated fully, either heartily approving, or pretending to look the other way with sly winks. It cannot now disclaim corporate responsibility and point to some scoundrelly individuals shouting, "He did it, not us!”
Moreover, when the dishonesty of employees concerns not defalcations but illegal trading activities and the violation of securities laws, that is not the kind of dishonesty loss which is contemplated by the policies of fidelity insurance — all the more so when the activities of the employees have accrued to the benefit of the company. Much of what Drexel seeks recovery for is indemnification for the claims of third persons who may have suffered as a result of the activities of Drexel and its employees. However, as previously pointed out, the policies covered only direct loss to the insured and excluded loss attributable to consequential damages.
There is no basis for a finding that a fidelity insurer must indemnify an insured which has incurred criminal fines and civil penalties. That is why, generally, punitive damages are not covered by insurance. "Since punitive damages in New York are awarded as punishment against a defendant and as a warning to others, it is self-evident that it would defeat New York’s expressed public policy to permit an insured to avoid the effect of the imposition of punitive damages by passing the burden of payment on to an insurance company.” (Padavan v Clemente, 43 AD2d 729, 730.) The sting of criminal penalties is not to be soothed by permitting its payment out of an insurance pool rather than directly by the wrongdoer. (See, Hartford Acc. & Indem. Co. v Village of Hempstead, 48 NY2d 218, 226-227.) "[T]o allow insurance coverage is totally to defeat the purpose of punitive damages.” (Supra, at 228.) It is longstanding public policy that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.” (Riggs v Palmer, 115 NY 506, 511) It is basic law that when parties are in particeps criminis, there is to be no indemnification for a culpable party. (Hertzfeld v Laventhol, Krekstein, Horwath & Horwath, 378 F Supp 112, 135, mod on other grounds 540 F2d 27.) Here, Drexel goes beyond seeking indemnity from another wrongdoer, but rather seeks recovery for its criminal conduct from insurers who have had no part in the wrongdoing. (See, Globus *214 v Law Research Serv., 418 F2d 1276, 1288; Messersmith v American Fid. Co., 232 NY 161.)
Indemnification from insurers for admitted criminal conduct cannot be permitted. Not only is it barred by considerations of public policy, but under the terms of the bonds knowledge of the dishonesty by the insured would terminate existing coverage and prevent the inception of new policies. Hence, dismissal is warranted as to all claims arising from the transactions as to which Drexel has pleaded guilty, all claims for third-party indemnification premised on Drexel’s willful acts, and all transactions involving Michael Milken and other persons whose names came to the attention of Drexel’s management during the criminal investigation.
OTHER UNSPECIFIED LOSSES
There appear to be portions of plaintiff’s fourth through eighth causes of action which may not be premised on claims connected with the criminal prosecution of Drexel, or which do not involve Milken, Levine and those working in collusion with them. It is difficult to tell whether this is actually the case because the allegations of plaintiff’s complaint are so vague and ambiguous that defendants are given no real notice of the transactions involved. It thus becomes difficult, if not impossible, to frame answers in response to these allegations. This is especially true in a case such as this where there are numerous insurers named as defendants, but the particular policies involved depend on when claimed acts of dishonesty were discovered. Since the complaint fails to specify what other losses are involved and when they were discovered, there is no way of knowing which of the defendant insurers may potentially cover such losses.
CPLR 3013 requires particularity in the pleadings to give notice of the transactions intended to be proved "and the material elements of each cause of action.” The plaintiffs, in the complaint, may not deal with alternative facts, for it is plain that knowledge of the facts as to the alleged dishonesty and discovery is knowledge in the possession of the plaintiff, and is not known to the defendants. Discovery of dishonesty is not a mere procedural condition precedent which need not be pleaded (Kaskel & Sons v Fidelity & Deposit Co., 277 App Div 366, affd 302 NY 762; see also, Adair State Bank v American Cas. Co., 949 F2d 1067; Central Natl. Life Ins. Co. v Fidelity & Deposit Co., 626 F2d 537). It is a substantive provision of the *215 bond which is a basis for liability. Like dishonesty, discovery should be alleged. Specifying the discovery date automatically releases the noncovering defendants. Plaintiff cannot assert a claim against a particular insurance company unless it clearly appears that the transactions alleged are within the period of coverage provided by a particular defendant. It would be manifestly unjust, and inordinately expensive, to require multiple defendants to participate in extended discovery and litigation if their policies do not even cover the applicable period. The complaint is deficient since it fails to indicate when discovery was made. Plaintiff annexes a 52-page list setting forth more than 1,200 claims alleged to have been covered with losses exceeding $1,000,000,000. There is no conceivable way defendants can respond to such a listing when persons involved and dates of discovery are not set forth.
Allegations that there were losses under the fidelity policies occasioned not only by Milken, et al., but by "others” is certainly inadequate under the requirements for particularity set forth in CPLR 3013. It is not enough to say that losses were sustained unconnected with Milken and Levine which were occasioned by the acts of "others.” (Cf., Aetna Cas. & Sur. Co. v Merchants Mut. Ins. Co., 84 AD2d 736; Empreza de Comercio v Fimex, Inc., 80 NYS2d 562.) Plaintiff must spell out the individuals involved, what transactions, when they occurred and when they were discovered. If there are other dishonest employees whose acts gave rise to claims, it is incumbent upon plaintiff to distinguish such claims and to set them forth.
It is not clear whether plaintiff will, in fact, be able to identify dishonest acts resulting in losses by "other” employees who were not acting in collusion with the named wrongdoers. Maybe it can. Accordingly, plaintiff will be given leave to replead within 30 days of the receipt of a copy of this decision with notice of entry, if it so chooses. In any amended complaint, the details must be set forth so that it is known which fidelity policy or policies are claimed to be implicated, and so that it is plain that any claims in the amended pleadings were discovered within appropriate policy periods, and do not encompass the very claims which were the subject of the criminal proceedings or as to which the defendants have, as indicated above, already been found to have no liability.
In any event, no claims will be permitted for discovery in the years after initial notice of the major frauds was given in *216 1986, since coverage by the insurers would have been terminated by that year at the latest.
Accordingly, the motion and cross motions by defendant insurers to dismiss the complaint are granted, with leave to Drexel to replead in accordance with the foregoing, if it chooses.

. Chubb & Son; McAteer and Fitzgerald Inc.; H.S. Weavers (Underwriting) Agencies Ltd.; Camomile Underwriting Agencies Ltd. and Munichre General Services Ltd.

. It is noted that the Vigilant policy covers costs and attorneys’ fees incurred in defense of any claims. Does this include third-party claims?