FOURTH DIVISION
March 13, 2008

No. 1-06-2899

| | | |
|---|---|---|
| BDO SEIDMAN, LLP, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 02 CH 10438 |
| | ) | |
| PETER HARRIS, Individually and as Agent For Those | ) | |
| Persons Subscribing to Insurance Policy No. 9624771 00; | ) | |
| NICK WARD, Individually and as Agent For Those Persons | ) | |
| Subscribing to Insurance Policy Nos. 9624772 00 and | ) | |
| 9624773 00; SYNDICATE 2020 at Lloyd's of London | ) | |
| (Lloyd's ); SYNDICATE 435 at Lloyd's; SYNDICATE 510 | ) | |
| at Lloyd's; SYNDICATE 190 at Lloyd's; SYNDICATE | ) | |
| 702 at Lloyd's; SYNDICATE 33 at Lloyd's; SYNDICATE | ) | |
| 1207 At Lloyd's; 839 at Lloyd's; with all the respect to | ) | Honorable |
| the 1999 year of account; LIBERTY MUTUAL INSURANCE | ) | Richard A. Seibel and |
| COMPANY (UK) LIMITED; QBE INTERNATIONAL | ) | Honorable |
| INSURANCE LIMITED; LEXINGTON INSURANCE | ) | Stuart E. Palmer, |
| COMPANY; and SR INTERNATIONAL BUSINESS | ) | Judges Presiding. |
| INSURANCE CO., LTD., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiff, BDO Seidman, LLP, brought an insurance coverage action against defendants, the underwriters of plaintiff's professional liability policy, for their failure to indemnify plaintiff against a loss allegedly covered by the policy. The trial court granted defendants' motion to dismiss count I of plaintiff's fourth amended complaint that sought indemnification for $16 million of plaintiff's total loss under the policy. Plaintiff appeals pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). We affirm.

Plaintiff is in the public accounting business and provided tax accounting services to

James R. Gibson and certain entities controlled by Gibson, specifically, SBU, Inc., and related entities (SBU). SBU had operated as a structured-settlement company, promising to assume liabilities of defendants in personal-injury actions, and to provide personal-injury plaintiffs a stream of funds based on the future value of the obligations assumed from the defendants. In exchange for assuming the liabilities of defendants in personal-injury actions, SBU received proceeds from the underlying settlements, which it was supposed to invest in order to provide a return to the injured plaintiffs.

SBU's contracts with the personal-injury plaintiffs required that it place the settlement proceeds in trust and invest them only in safe United States Treasury instruments, to ensure that they always would be available to cover long-term medical costs and other expenses. SBU was not required to report the funds as income, as funds invested in government securities qualify for exemption under Internal Revenue Code section 130 (26 U.S.C. §130 (1994)).

From October 1994 to September 1996, Gibson diverted the funds held in trust and instead invested them in a chain of grocery stores. Prior to doing so, SBU and Gibson sought guidance from plaintiff. Plaintiff advised that Gibson could use the funds, but that doing so would constitute a taxable event, as the funds no longer would qualify under Internal Revenue Code section 130. Plaintiff also advised Gibson that he would have to purchase additional United States Treasury obligations to replace the liquidated United States Treasury obligations in SBU's clients' trusts. Gibson proceeded to divert the funds, but failed to report that income to the Internal Revenue Service.

In January 2002, Gibson pleaded guilty to conspiracy to commit mail and wire fraud.

Gibson's conviction was vacated in January 2004, but on remand he was convicted again and re-sentenced.

On April 12, 2002, the United States Attorney charged plaintiff with misprision of felony, alleging that plaintiff knowingly concealed the felony fraud of its client, SBU. Plaintiff waived its right to be prosecuted by indictment, and agreed to be prosecuted via a criminal information. The US Attorney's Office (USAO) and plaintiff ultimately agreed to resolve the USAO investigation through entry of a pretrial diversion agreement (PTD agreement.) Pursuant to the PTD agreement, prosecution was deferred while plaintiff completed 18 months of supervision.

Per the PTD agreement, plaintiff was required to cooperate with the government investigation by providing testimony and producing documents. Further, plaintiff agreed to pay $16 million to a "fund established by the Government for the victim restitution of former clients of SBU." The $16 million represented the amount that Gibson had received from his clients and failed to report as taxable income. The PTD agreement provided that any unused funds would be "distributed to the United States Postal Inspection Service Consumer Fraud Awareness Fund Account, said monies to be used to support activities which facilitate and support the prevention and investigation of frauds against the public."

On April 12, 2002, plaintiff and the USAO appeared before the federal district court to obtain judicial approval of the PTD agreement. Pursuant thereto, the parties presented the court with a stipulation of facts. In pertinent part, the parties stipulated as follows:

"10. Between in or about April and June 1996, partners and employees of

[plaintiff's] former St. Louis office prepared the SBU, Inc. (Florida) tax return for tax year 1995. In connection with the preparation of that return, partners of the former St. Louis office, including Stephen R. Krause and Douglas Beckmeyer, were aware that Gibson and SBU had failed to purchase United States Treasury obligations for certain structured settlement trusts and that SBU was making periodic payments to certain of those structured settlement clients. At Gibson's direction, Stephen R. Krause thereafter listed those settlement funds received as 'liabilities' on the SBU, Inc. (Florida) return for tax year 1995. No federal tax was paid on those 'liabilities.' Stephen R. Krause forwarded the prepared tax return to Gibson for filing on June 24, 1996.

11. During in or about October, 1996, partners of the former St. Louis office, including Stephen R. Krause and Douglas Beckmeyer, knew and understood that, in order to finance the purchase and operation of the grocery store chain, Gibson and SBU sold United States Treasury obligations which had been held in certain of SBU's clients' trusts. Partners in the former St. Louis office, including Stephen R. Krause and Douglas Beckmeyer, also knew and understood that Gibson and SBU used SBU's clients' settlement funds to purchase and operate the grocery store chain instead of to purchase United States Treasury obligations to fund SBU's clients' trusts.

12. Partners in the former St. Louis office, including Stephen R. Krause and Douglas Beckmeyer, knew and understood that Gibson and SBU received approximately sixteen million dollars ($16,000,000) in settlement funds between October, 1994 and September, 1996, but had not purchased United States Treasury obligations with these

funds.

13. On or about July 7, 1997, the Internal Revenue Service (IRS) sent to SBU, Inc. (Florida), a Notice of Tax Examination for the tax year ending October 31, 1993 (hereinafter referred to as the 'tax examination'). During the course of that tax examination, the IRS inquired about documents relating to tax years 1994 and 1995.

14. During July or August, 1997, partners of the former St. Louis office, including Stephen R. Krause, Douglas Beckmeyer, and the managing partner of the former St. Louis office, Walter Knepper, had internal discussions concerning Gibson's and SBU's failure to purchase United States Treasury obligations for certain structured settlement clients' trusts and the use of SBU's clients' settlement funds and bonds to purchase and operate the grocery store chain.

15. On or about September 9, 1997, Gibson executed a power of attorney on behalf of SBU, Inc. (Florida) authorizing Stephen R. Krause of BDO to act as the taxpayer representative in connection with the tax examination described in paragraph 13, above. The power of attorney was subsequently transmitted to the IRS.

16. On December 18, 1997, Stephen R. Krause and Gibson discussed the failure by Gibson and SBU to purchase United States Treasury obligations with settlement funds received during 1995 and 1996. Stephen R. Krause informed Gibson that the receipt of those funds would be 100% taxable as income. At that time, Stephen R. Krause knew that Gibson's receipt and use of the funds to purchase and operate the grocery store chain resulted in taxable income to SBU and that SBU and Gibson had failed to report that

income to the IRS.

17. On January 8, 1998, in response to the IRS' December 17, 1997 request for documents, Stephen R. Krause submitted documents in connection with the ongoing tax examination (the 'Submission'). At that time, Krause knew that Gibson had committed a felony in connection with the tax year 1995 return, to wit, attempted tax evasion, in violation of Title 26, United States Code, Section 7201. In that Submission, Krause failed to inform the IRS of information that was material to the determination of income for tax year 1995, i.e. that Gibson had not purchased United States Treasury obligations with settlement funds received and that Gibson had, instead, used those funds to purchase and operate the grocery stores which were not qualified assets under Internal Revenue Code Section 130."

After the district court was presented with the stipulation of facts, plaintiff's vice-chairman Jack Weisbaum engaged in the following colloquy with the court:

"[THE COURT]: I was *** presented this afternoon a stipulation of facts consisting of six typewritten pages. *** [I]t appears that your signature as vice-chairman appears on here, that of Jack A. Weisbaum. Is that in fact your signature on the stipulation of facts?

[MR. WEISBAUM]: It [is], your Honor.

[THE COURT]: Very well. *** Do you understand the legal parlance of a stipulation of facts, what it means to say that you stipulate to facts?

[MR. WEISBAUM]: I do, your Honor.

[THE COURT]: Would you tell me just generally what your understanding is.

[MR. WEISBAUM]: My understanding is that based on my information and knowledge that the facts that we are stipulating are true, in fact did occur in the way that they are depicted to have occurred.

***

[THE COURT]: *** What you are telling me is that everything in here is true.

[MR. WEISBAUM]: That is correct, your Honor.

[THE COURT]: And that further means that *** it is unnecessary for the government to prove any of this because you agree with the government and indeed you represent to the court and you're asking the court to act on that representation that all this is true.

[MR.WEISBAUM]: That is correct, your Honor.

[THE COURT]: All right. The court finds that the stipulation of facts sets out and recites facts that are facts indeed and that it is unnecessary for the government to prove any of the matters contained therein."

On August 27, 2003, the district court entered an order finding that plaintiff "has fully complied with all requirements" of the PTD agreement. Accordingly, the court dismissed the criminal information with prejudice. The order further made clear that "[plaintiff] did not enter a guilty plea in the above-captioned matter, the Court never entered a judgment of conviction against [plaintiff] in the above-captioned matter and the Court does not do so now."

Meanwhile, at all relevant times, plaintiff maintained professional liability insurance

coverage from defendants and other insurance companies that agreed to participate in plaintiff's professional liability insurance program. Plaintiff paid premiums totaling $4,620,000 to just the primary layer of insurers to obtain the benefits of these policies. Defendants acted as lead underwriters and insured plaintiff under three separate but related policies, while the excess insurers underwrote specific percentages of the total insurance provided and insured plaintiff under seven separate policies. Plaintiff paid millions more in premiums to the excess insurers for that coverage.

Pursuant to the policy language, defendants agreed to indemnify plaintiff up to the specified amounts "against loss, including but not limited to associated expenses" arising from "any act, error [or] omission" during the provision of professional services.

In the wake of the filing by Gibson's victims of various civil lawsuits, plaintiff timely advised defendants of the first of the SBU-related civil actions, as well as the additional civil lawsuits and the USAO's criminal investigation. On April 17, 2002, defendants denied coverage pursuant to a policy exclusion that states:

> "This policy excludes *** [t]o the extent it is uninsurable by law: (a) any claim or claims for fines, penalties, punitive or exemplary damages imposed by a judgment or any other final adjudication."

Plaintiff filed an amended complaint against defendants on July 1, 2002, seeking damages and a declaration of coverage. Defendants filed a motion to dismiss under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2004)). On January 12, 2004, the circuit court dismissed in pertinent part a portion of count I of plaintiff's amended complaint

No. 1-06-2899

relating to indemnification of the $16 million in restitution payments. The circuit court found that New York law governed the parties' rights and obligations. The court denied coverage under the public policy of New York because it found that the $16 million was a "punitive payment" and "criminal restitution."

Plaintiff subsequently filed a fourth amended complaint. In count I, plaintiff reasserted the allegations that it was entitled to indemnification of the $16 million. On October 3, 2006, the circuit court issued its written order dismissing with prejudice count I of plaintiff's fourth amended complaint. The court stated that the January 12, 2004, order and the October 3, 2006, order were "now final and immediately appealable and there is no just reason for delaying either enforcement or appeal." Plaintiff filed this timely appeal.

A dismissal under section 2-619(a)(9) resembles the grant of a motion for summary judgment. Van Meter v. Darien Park District, 207 Ill. 2d 359, 377 (2003). In reviewing such a dismissal, the court considers whether the existence of a genuine issue of material fact should have precluded the dismissal or whether, absent an issue of material fact, dismissal was proper as a matter of law. Van Meter, 207 Ill. 2d at 377-78. Review is de novo. Van Meter, 207 Ill. 2d at 377. A dismissal order may be affirmed "if it is justified in the law for any reason or ground appearing in the record regardless of whether the particular reasons given by the trial court, or its specific findings, are correct or sound." Natural Gas Pipeline Co. of America v. Phillips Petroleum Co., 163 Ill. App. 3d 136, 142 (1987).

In the present case, the parties agree that New York law is controlling, and that Drexel Burnham Lambert Group, Inc. v. Vigilant Insurance Co., 595 N.Y.S.2d 999, 157 Misc. 2d 198

(1993) sets forth the applicable New York public policy. Investment bank Drexel Burnham sought insurance coverage after pleading guilty to mail and securities fraud and paying $650 million in criminal and civil penalties stemming from the illegal acts of its employees. Drexel Burnham, 595 N.Y.S.2d at 1010, 157 Misc. 2d at ___. In finding for the insurers, the court held:

> "It is long standing public policy that 'no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.' [Citation.] It is basic law that when parties are in particeps criminis, there is to be no indemnification for a culpable party. [Citation.]
>
> ***
>
> Indemnification from insurers for admitted criminal conduct cannot be permitted. [It is] barred by considerations of public policy." Drexel Burnham, 595 N.Y.S.2d at 1010, 157 Misc. 2d at ___.

In the present case, as discussed above, the USAO charged plaintiff with misprision of felony under 18 U.S.C. §4 (1994), alleging that plaintiff knowingly concealed the felony fraud of its client, SBU. The misprision statute provides:

> "Misprision of felony
>
> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." 18

U.S.C. §4 (1994).

As discussed, in response to the charge of misprision of felony, the parties entered into a PTD agreement deferring prosecution. The parties also stipulated: that plaintiff was aware of SBU's fraud relating to SBU's use of clients' settlement funds to purchase and operate a grocery store chain instead of to purchase United States Treasury obligations; that plaintiff knew that the receipt and use of the funds to purchase and operate the grocery store chain resulted in taxable income to SBU and that SBU and Gibson had failed to report that income to the IRS; and that in January 1998, plaintiff responded to an IRS request for documents, but failed to report therein that Gibson had committed attempted tax evasion by investing the settlement funds in grocery stores instead of United States Treasury instruments. Plaintiff's vice-chairman expressly affirmed the stipulation of facts in open court.

Taken together, the stipulation of facts pursuant to the PTD agreement shows that plaintiff engaged in conduct which constituted misprision of felony by knowingly concealing the felony fraud of its client, SBU. Under New York public policy, as set forth in Drexel Burnham, indemnification for such criminal conduct is barred by public policy.

Plaintiff contends that the conduct admitted in the stipulation was not plaintiff's, but rather only that of plaintiff's St. Louis office. Plaintiff's contention is without merit, where the PTD agreement states that it was executed based on plaintiff's "accepting responsibility for your [plaintiff's] behavior as set forth in the 'Stipulation of Facts' and by your authorized signature on this Agreement." Moreover, the district court asked plaintiff's vice-chairman, Mr. Weisbaum, "What I want to be sure, though, from you while you are here, do you understand that, first of all,

-11-

No. 1-06-2899

you are binding *** in this case BDO Seidman, LLP?"  Mr. Weisbaum responded, "I do, your Honor."

Accordingly, we affirm the January 12, 2004, and October 3, 2006, dismissal orders.

Affirmed.

NEVILLE, P.J., and MURPHY, J., concur.