FOURTH DIVISION
FILED: December 29, 2006

No. 1-05-2536

| | | |
|---|---|---|
| BILL WHITE, OTIS ENGLISH, and ROLAND GRAY, | ) ) | Appeal from the Circuit Court of Cook County, Law Division |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 03 L 7656 |
| | ) | |
| THE CITY OF CHICAGO; COOK COUNTY, ILLINOIS; EDWARD LOUIS; JOHN TURNEY; and NICK ROSSI, | ) ) ) | Honorable Philip L. Bronstein, Judge Presiding |
| | ) | |
| Defendants | ) | |
| | ) | |
| (RICHARD DEVINE and JOHN MURPHY, | ) | |
| | ) | |
| Defendants-Appellees.) | ) | |

JUSTICE MURPHY delivered the opinion of the court:

In May 2003, plaintiff Bill White was acquitted of first-degree murder charges after spending five years in jail. Charges against co-plaintiffs Otis English and Roland Gray, who also spent five years in jail awaiting trial, were dismissed. Plaintiffs filed suit against the City of Chicago; Cook County; several Chicago police officers; Richard A. Devine, the Cook County State's Attorney; and John Murphy, an assistant State's Attorney, alleging that they concealed information that would have exonerated plaintiffs. The trial court granted Devine's and Murphy's motions to dismiss plaintiffs' amended complaint on the basis of absolute prosecutorial immunity

and denied plaintiffs' motion for reconsideration. On appeal, plaintiffs contend that the trial court

erred in finding that defendants enjoy absolute immunity because they were acting in an

investigative or administrative instead of an advocative capacity.

## I. BACKGROUND

When ruling on a section 2-619 motion to dismiss, a court interprets all well-pled facts and

reasonable inferences therefrom as true and interprets all pleadings and supporting documents in

the light most favorable to the nonmoving party. *Hermitage Corp. v. Contractors Adjustment

Co.*, 166 Ill. 2d 72, 85 (1995); *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003).

Therefore, we take the following facts alleged in plaintiffs' amended complaint as true.

Plaintiffs were arrested for the May 6, 1997, murders of Che Messner and Kelly

Fitzgerald. Plaintiffs' amended complaint alleged that Michael Fields, a friend of Messner and

Fitzgerald, contacted Chicago police within 48 hours of the discovery of the bodies. He told them

that he saw two individuals, one Hispanic and one African American, at the victims' apartment at

10 p.m. on May 5, 1997. The Hispanic male was "standing over" Messner, who was on his

knees, and the African American was sitting next to Fitzgerald on the couch.

A month later, Fields identified the African American in a lineup as DeAndre Jackson, a

member of the Latin Kings street gang, and gave a description of the Hispanic man, from which

the police prepared a composite sketch. Messner and Fitzgerald's neighbor identified the man

depicted in the composite as similar in appearance to the person the neighbor saw fleeing from the

building at 10:30 p.m. on the night of the murders. The amended complaint alleges that the police

learned that Jackson had done a home invasion and committed a murder in the immediate vicinity

of the Messner/Fitzgerald murders. In addition, one of the bullets removed from Messner's head matched bullets recovered from a shooting several months before the murders. The police report for that shooting identified the assailants as "Kings." Jackson was released without being charged. "Based on ballistic evidence and witness statements," the police were also searching for a Hispanic member of the Latin King street gang whose name was Ronnie.

In October 1997, Eugene Hawes called Chicago police about a burglary committed by White, his cousin. Hawes, who was "very angry" at White, reported that he had information about the murders of a Caucasian couple that had occurred near Wrigleyville. When police detectives interviewed him, Hawes claimed that he overheard White say at a birthday party in May 1997 that he shot Messner once and that English had shot Fitzgerald once. However, Messner and Fitzgerald had each been shot three times. Furthermore, White stated that he had committed the crime with the assistance of Rafael Arguelles, but detectives verified that he was not involved. Hawes claimed that White told him that White committed the crimes and informed him of such in January 1997, which was several months before the crimes were committed. The amended complaint alleges that detectives later altered their police report to indicate that White made this statement in May 1997.

Plaintiffs, all African American, were arrested in November 1997. Each plaintiff signed a confession stating that he acted as a "lookout" in the crime. Plaintiffs alleged that these statements differed from the actual facts of the crime and that the detectives beat them to elicit the confessions. The detectives presented this information to a grand jury, which indicted plaintiffs for the murders in December 1997. Plaintiffs were denied bond because the State's Attorney's

office intended to seek the death penalty.

The amended complaint further alleges that in 1999, the Cook County State's Attorney's office, led by Devine, began its own "investigation" into the murders. This "first investigation" revealed that Fitzgerald was concerned for her safety because of Messner's new drug connection, a man named Ronnie, who had an African American bodyguard. On the day he died, Messner was concerned about a large drug debt that he owed. It also revealed that Hawes' testimony was untrue, that plaintiffs' confessions were not corroborated by the objective physical evidence, and that the investigation by the police was unreliable. In addition, several people that Hawes said were present during White's original admission denied being present or hearing any admission from White. The "first investigation" also revealed that there was no connection between plaintiffs and the crime they allegedly committed. However, plaintiffs remained in custody without bond.

In March 2003, the State's Attorney's office began a "second investigation" when they were informed by the FBI that an original suspect in the murders was in custody and charged with a series of murders similar to the Messner/Fitzgerald murders. The amended complaint alleged that, in an effort to conceal the results of the first investigation, Devine assigned Murphy to conduct an investigation instead of ordering an independent investigation. Plaintiffs allege that Murphy was not the trial prosecutor of plaintiffs nor was he ever involved in the prosecution. He also testified at White's trial.

On March 5, 2003, as part of the "second investigation," Murphy located "Ronnie," an original suspect later identified as Ronald Garcia, who had not been located during the Chicago

police investigations. Murphy traveled out of state to "interrogate" Garcia. During the interrogation, Garcia made several inculpatory statements that were consistent with Fields' statements that Garcia sold narcotics. However, plaintiffs allege that Murphy, on Devine's instructions and intending to hinder plaintiffs' defense, failed to subpoena Garcia as a material witness, conduct a lineup with Garcia, or show a photograph of Garcia to any witness. Murphy also interviewed Hawes as part of his investigation and found Hawes' statements to be factually impossible.

The amended complaint further alleged that at a meeting with defense counsel on April 8, 2003, Devine indicated that he was aware of the factual impossibility of Hawes' statements and that at his direction, Hawes had been paid more than $4,000 to provide such testimony before the grand jury and at plaintiffs' trial. Plaintiffs allege that Devine and Murphy "procured, induced, and encouraged" Hawes to falsely testify before the grand jury and at the trial. Devine continued to direct that the State's Attorney's office provide Hawes compensation up to and after White's trial.

White was tried for the murders. In May 2003, White was acquitted of the murder charges, and the charges against plaintiffs were dismissed. The circuit court found Hawes' testimony to be "worthless." White, English, and Gray had spent five years in Cook County jail.

Plaintiffs' amended complaint alleges wrongful imprisonment, intentional infliction of emotional distress, and conspiracy against Devine and Murphy. Claims against the other defendants were settled or otherwise dismissed. The trial court dismissed the counts against Devine and Murphy pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619

(West 2004)) based on absolute immunity and denied plaintiffs' motion for reconsideration.

## II. ANALYSIS

### A. Absolute Prosecutorial Immunity

Plaintiffs contend that their amended complaint contains allegations of purely investigative acts that were not connected to the initiation or presentation of a criminal case in court. Because such investigative acts are outside a prosecutor's "judicial/prosecutorial" function, according to plaintiffs, defendants are entitled only to qualified immunity, which is overcome by pleading bad faith.

The granting of a motion to dismiss pursuant to section 2-619 is reviewed *de novo*. *Bureau Service Co. v. King*, 308 Ill. App. 3d 835, 838 (1999). The burden to prove that immunity exists is on the party seeking the immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 125 L. Ed. 209, 223, 113 S. Ct. 2606, 2613 (1993).

A prosecutor is absolutely immune only for those activities "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 47 L. Ed. 2d 128, 143, 96 S. Ct. 984, 995 (1976). The Supreme Court has adopted a "functional approach," which analyzes the nature of the function performed, not the identity of the actor who performed it. *Buckley*, 509 U.S. at 269, 125 L. Ed. 2d at 226, 113 S. Ct. at 2613. However, when a prosecutor performs the investigative functions normally performed by a police officer, absolute immunity does not apply. *Buckley*, 509 U.S. at 273, 125 L. Ed. 2d at 226, 113 S. Ct. at 2616.

*Imbler* and its progeny outline the application of absolute immunity for a prosecutor. In *Imbler*, a prosecutor was accused of knowingly using false testimony and suppressing exculpatory

evidence at Imbler's trial. Because the prosecutor's activities in initiating a prosecution and presenting the State's case were "intimately associated with the judicial phase of the criminal process," the prosecutor was immune from a civil suit for damages under section 1983 of the Civil Rights Act (42 U.S.C. § 1983 (1976)). *Imbler*, 424 U.S. at 430, 47 L. Ed. 2d at 143, 96 S. Ct. at 995. The Court declined to decide whether a prosecutor would enjoy absolute immunity for aspects of a prosecutor's responsibility that cause him or her in the role of administrator or investigator instead of advocate, but it noted that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n.33, 47 L. Ed. 2d at 144 n.33, 96 S. Ct. at 995, n.33. This includes actions "preliminary to the initiation of a prosecution and actions apart from the courtroom" as well as out-of-court efforts "to control the presentation of [a] witness' testimony." *Imbler*, 424 U.S. at 430-31 nn.32-33, 47 L. Ed. 2d at 144 nn.32-33, 96 S. Ct. at 995 nn.32-33.

In *Burns v. Reed*, 500 U.S. 478, 114 L. Ed. 2d 547, 111 S. Ct. 1934 (1991), the prosecutor advised police during the investigative phase that they could proceed with hypnosis, through which they obtained a confession, and that they "probably had probable cause" to arrest Burns. Burns also alleged that the prosecutor suborned perjury when he participated in a probable-cause hearing. The Court held that absolute immunity for a prosecutor's actions in a probable-cause hearing was justified because appearing before a judge and presenting evidence in support of a motion for a search warrant "clearly involve the prosecutor's 'role as advocate for the State,' rather than his role as 'administrator or executive officer.' " *Burns*, 500 U.S. at 491, 114 L. Ed. 2d at 561, 111 S. Ct. at 1941. Appearing at a probable-cause hearing is " 'intimately

associated with the judicial phase of the criminal process' " and is connected with the initiation and conduct of a prosecution, "particularly where the hearing occurs after arrest." *Burns*, 500 U.S. at 492, 114 L. Ed. 2d at 562, 111 S. Ct. at 1942, quoting *Imbler*, 424 U.S. at 430, 47 L. Ed. 2d at 143, 96 S. Ct. at 995. However, advising the police during the investigative phase of a criminal case is not intimately associated with the judicial phase of the criminal process, especially considering the lack of common-law support and the reduced risk of vexatious litigation for giving legal advice. *Burns*, 500 U.S. at 493, 114 L. Ed. 2d at 562-63, 111 S. Ct. at 1943. Therefore, absolute immunity applied to the court appearance but not to the prosecutor's act of providing advice to the police. *Burns*, 500 U.S. at 496, 114 L. Ed. 2d at 564, 111 S. Ct. at 1944.

The Supreme Court further expanded on the *Imbler* approach in *Buckley*. In *Buckley*, a murder defendant alleged that prosecutors, working with police detectives, conspired to manufacture false evidence that would link his boot with a bootprint found at the scene of the crime. The Court noted a difference between the "advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial" and the "detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Buckley*, 509 U.S. at 273, 125 L. Ed. 2d at 226, 113 S. Ct. at 2616. When a prosecutor performs the investigative functions normally performed by the police, he or she has no greater claim of absolute immunity than the police. *Buckley*, 509 U.S. at 274, 125 L. Ed. 2d at 226, 113 S. Ct. at 2616. The Court found that prosecutors were not functioning as "advocates" when they were attempting to determine whether the bootprint was Buckley's. *Buckley*, 509 U.S. at 274, 125 L. Ed. 2d at 227, 113 S. Ct. at 2616. Their mission was entirely investigative because they

did not have probable cause to arrest the defendant or to initiate judicial proceedings during that period. *Buckley*, 509 U.S. at 274, 125 L. Ed. 2d at 227, 113 S. Ct. at 2616. A prosecutor cannot consider himself to be an advocate before he has probable cause to have anyone arrested. *Buckley*, 509 U.S. at 274, 125 L. Ed. 2d at 227, 113 S. Ct. at 2616.

Finally, in *Kalina v. Fletcher*, 522 U.S. 118, 129, 139 L. Ed. 2d 471, 480, 118 S. Ct. 502, 509 (1997), the Court found it "quite clear" that a prosecutor's preparation and filing of an information and motion for an arrest warrant were protected by absolute immunity. However, because the prosecutor personally attested to the truth of the averments in the certification for determination of probable cause "under penalty of perjury," she was not entitled to absolute immunity. "Testifying about facts is the function of the witness, not of the lawyer." *Kalina*, 522 U.S. at 130, 139 L. Ed. 2d at 482, 118 S. Ct. at 510.

Plaintiffs argue that defendants performed "investigatory acts" when they participated in the two investigations and did not appear as advocates in the prosecution of plaintiffs. Specifically, plaintiffs' allegedly investigative or administrative actions can be distilled as follows: (1) Devine directed a "first investigation" in 1999 that revealed information that was exculpatory to plaintiffs; however, plaintiffs remained in custody without bond; (2) in March 2003, under Devine's direction, Murphy interviewed Hawes and traveled out of state to "interrogate" Garcia; (3) Murphy acted as a witness in plaintiffs' trial; and (4) Devine and Murphy "procured, induced, and encouraged" Hawes to testify falsely at White's trial and before the grand jury and Devine paid Hawes for false testimony before the grand jury and at White's trial.

### 1. *Murphy*

Plaintiffs claim that Murphy acted as an investigator when he interviewed Hawes and traveled out of state to "interrogate" Garcia in 2003. Although plaintiffs cloak their allegations in terms of an "investigation," when the claims are boiled down to their essentials, they simply allege that Murphy interviewed Hawes and left the state to interview Garcia. Just as a court is required to look to the nature of the function performed instead of the title of the actor (*Buckley*, 509 U.S. at 269, 125 L. Ed. 2d at 223, 113 S. Ct. at 2613), it should also look to the nature of the acts performed instead of the label plaintiffs bestow on them.

Murphy's actions in interviewing Hawes and Garcia fall within the purview of "the obtaining, reviewing, and evaluating of evidence" that is required to prepare for the initiation of the criminal process and a trial. *Imbler*, 424 U.S. at 431 n.33, 47 L. Ed. 2d at 144 n.33, 96 S. Ct. at 996 n.33. This preparation includes actions "preliminary to the initiation of a prosecution and actions apart from the courtroom" as well as out-of-court efforts "to control the presentation of [a] witness' testimony." *Imbler*, 424 U.S. at 430-31 nn.32-33, 47 L. Ed. 2d at 144 nn.32-33, 96 S. Ct. at 996 nn.32-33. Hawes, whom the police first interviewed in October 1997, was clearly a known witness. Plaintiffs argue that Murphy "set out looking for suspects" and "traveled to another state and eventually discovered" a "new suspect," Garcia. However, this is not an accurate portrayal of the allegations contained in the amended complaint. The amended complaint clearly identifies Garcia as an "original suspect" and alleges that during their investigation, the police searched for "Ronnie," a Hispanic member of the Latin Kings who was later identified as Garcia, based on ballistic evidence and witness statements. The fact that the

police were unable to physically locate Garcia did not reduce his status as an original suspect during the police investigation and, therefore, a potential witness.

The timing of the interviews supports our conclusion that Murphy's actions were associated with the judicial phase of the criminal process instead of the investigatory phase. See, e.g., *Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005). Murphy's March 2003 interviews occurred the month before White's trial started on April 28, 2003, and more than five years after the grand jury indicted plaintiffs in December 1997.

In *Buckley*, the Court denied absolute immunity to prosecutors who allegedly fabricated evidence "during the early stage of the investigation" when "police officers and assistant prosecutors were performing essentially the same investigatory functions." *Buckley*, 509 U.S. at 262-63, 125 L. Ed. 2d at 219, 113 S. Ct. at 2610. The Court noted a difference between the "advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial" and the "detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Buckley*, 509 U.S. at 273, 125 L. Ed. 2d at 226, 113 S. Ct. at 2616. The prosecutors' mission in *Buckley* was entirely investigative because they did not have probable cause to arrest the defendant or to initiate judicial proceedings during that period. *Buckley*, 509 U.S. at 274, 125 L. Ed. 2d at 227, 113 S. Ct. at 2616. Plaintiffs rely on other federal cases that similarly hold that absolute immunity did not apply when the prosecutors' actions occurred before charges were filed. See *Rex v. Teeples*, 753 F.2d 840 (10th Cir. 1985) (prosecutor gave *Miranda* warnings to a general suspect and participated in his interrogation before charges were filed); *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) (prosecutor

participated in an illegal search and seizure); *Lehman v. Kornblau*, 134 F. Supp. 2d 281 (E.D.N.Y. 2001) (prosecutor helped plan a sting operation and suborned perjury by helping a police officer with his warrant application); *Richards v. City of New York*, No. 97 Civ. 7990 MBM (S.D.N.Y. September 3, 1998) (prosecutors not immune for acts related to supervising, advising, and assisting police in their investigation leading to the plaintiff's arrest).

At the other temporal extreme are cases cited by plaintiffs where the investigation occurred postconviction. In *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992), prosecutors allegedly withheld exculpatory evidence discovered during the pendency of the criminal appeal. The prosecutors had already succeeded in obtaining the convictions of the defendants and the prosecution of the appeal had been passed on to others in the State's Attorney's office, so they "were not functioning as prosecutors" when they failed to disclose the evidence. *Houston*, 978 F.2d at 366. Because the alleged prosecutorial abuses occurred *after* conviction, the prosecutors were not entitled to absolute immunity. *Houston*, 978 F.2d at 368. Similarly, in *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995), the criminal defendant alleged that prosecutors delayed performing a posttrial investigation after his father uncovered powerful evidence suggesting his innocence. The court found that the prosecutors' investigators "actively gathered and corroborated evidence of the [defendant's] innocence," functions typically performed by police. *Guzman-Rivera*, 55 F.3d at 30. Noting that the case mirrored *Buckley* in the posttrial context because there was no postconviction proceeding pending at the time of the prosecutors' investigation, the court held that the prosecutors were not entitled to absolute immunity. *Guzman-Rivera*, 55 F.3d at 31.

1-06-1537

Neither *Houston* nor *Guzman-Rivera*, as postconviction cases, is applicable here, where the complained-of actions occurred before the trial. Furthermore, while the *Buckley* Court warned that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards" (*Buckley*, 509 U.S. at 274 n.5, 125 L. Ed. 2d at 227 n.5, 113 S. Ct. at 2616 n.5; see also *King v. Timmoney*, 263 F. Supp. 2d 977 (E.D. Pa. 2003) (although the defendant had been arrested, the prosecutor was not entitled to absolute immunity because he was performing an administrative function when he failed to secure a timely hearing date for 75 days)), the nature of the interviews combined with their timing the month before the trial and more than five years after the indictment persuades us that Murphy was acting as an advocate and not as a detective.

*Spiegel v. Rabinovitz*, 121 F.3d 251 (7th Cir. 1997), is persuasive. In *Spiegel*, the plaintiff was involved in an altercation with his neighbors. When the other two people involved learned that the plaintiff had pursued criminal charges, they, in turn, filed criminal battery complaints against him. A prosecutor was assigned to assess whether the State's Attorney's office should pursue one or both of the cases in question. He reviewed police reports, spoke to police officers, questioned the people involved, and submitted his evaluation to his superiors. *Spiegel*, 121 F.3d at 253. The State's Attorney's office decided to pursue only the case against the plaintiff, who was tried and acquitted. He filed suit against the prosecutor who recommended that the case against him be pursued, claiming that he functioned as an investigator. The Seventh Circuit determined that the prosecutor simply evaluated the evidence assembled when he reviewed the police records, interviewed the parties, and passed on his assessment to his superior. *Spiegel*, 121

-13-

F.3d at 257.  Under *Buckley*, a prosecutor assumes the role of advocate once there is probable cause for arrest.  *Spiegel*, 121 F.3d at 257.  Because the police reports and two complaints demonstrated probable cause, the prosecutor was absolutely immune from suit.  *Spiegel*, 121 F.3d at 257.  Similarly, in *Hampton v. City of Chicago*, 349 F. Supp. 2d 1075, 1081 (N.D. Ill. 2004), a felony review prosecutor enjoyed absolute immunity when he interviewed witnesses, decided what information was necessary for trial, and approved charges against the plaintiff.

Plaintiffs suggest that absolute liability is limited to what prosecutors do within the courtroom as a "trial prosecutor."  The plaintiff in *Buckley* made that same argument; however, the Supreme Court rejected this "extreme position" as foreclosed by the plain language of *Imbler*, where the Court stated that the duties of prosecutors in their role as advocates for the State involve " 'actions apart from the courtroom.' "  *Buckley*, 509 U.S. at 272, 113 S. Ct. at 2615, 125 L. Ed. 2d at 226, quoting *Imbler*, 424 U.S. at 431 n.33, 47 L. Ed. 2d at 144 n.33, 96 S. Ct. at 995 n.33.  Therefore, contrary to plaintiffs' argument, a prosecutor need not be "sitting in his office" while reading reports presented by the police or interviewing witnesses to enjoy absolute immunity.

The amended complaint also alleges that Murphy testified as a witness in White's trial.   In *Kalina*, 522 U.S. at 130, 139 L. Ed. 2d at 482, 118 S. Ct. at 510, the Court held that a prosecutor was not entitled to absolute immunity for her acts in executing a certification for determination of probable cause because "[t]estifying about facts is the function of the witness, not of the lawyer."  Similarly, in *Aboufariss v. City of DeKalb*, 305 Ill. App. 3d 1054, 1064 (1999), the court noted

that if the prosecutor had signed a certification document, the nature of her prosecutorial function would have been changed.

However, plaintiffs do not argue that Murphy is liable for his testimony, nor do they analyze the application of immunity to the act of testifying. Instead, plaintiffs suggest that Murphy's act of testifying at White's trial supports their argument that he was working as an investigator instead of advocate when he interviewed Hawes and Garcia in March 2003.

Plaintiffs do not cite any authority in support of their suggestion that Murphy's acting as a witness at trial transformed his role from advocate to investigator. Failure to cite authority constitutes a violation of Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7)). *Novakovic v. Samutin*, 354 Ill. App. 3d 660, 667 (2004). Waiver notwithstanding, however, we find that Murphy's acting as a witness at trial was insufficient alone to convert his March 2003 interviews, which involved the "obtaining, reviewing, and evaluating" of evidence, into an investigation.

Because Murphy's activities in interviewing two known witnesses were "intimately associated with the judicial phase of the criminal process," the trial court properly found that absolute immunity applied to the "second investigation." In addition, where Murphy was absolutely immune for conducting the interviews, Devine also enjoyed absolute immunity for allegedly directing them.

## 2. Devine

The amended complaint alleges that in 1999, the State's Attorney's office, under the direction of Devine, began its own "investigation" into the Messner/Fitzgerald murders. Plaintiffs

allege that although the first investigation revealed a variety of exculpatory evidence, plaintiffs remained in custody without bond.

That the first investigation occurred one to two years after plaintiffs' arrests and indictments suggests that the State's Attorney's office was simply "obtaining, reviewing, and evaluating" evidence in preparation for the trial. See *Buckley*, 509 U.S. at 273, 125 L. Ed. 2d at 227, 113 S. Ct. at 226. Furthermore, the nature of the information that the "first investigation" revealed, much of which related to evidence that had been first identified by the police, further supports this conclusion. For example, Fitzgerald's concern about Messner's new drug connection, a Hispanic man named Ronnie, related to the police investigation identifying "Ronnie" as a suspect. In addition, the alleged unreliability of the officers' investigation would have been implicated at the hearing on plaintiffs' motion to suppress their confessions. Furthermore, Hawes was already a known witness, and, as explained above, it was reasonable for the State's Attorney's office to review and evaluate the evidence he was to offer at trial. Accordingly, Devine was absolutely immune for directing the investigations and allowing plaintiffs to remain in custody. See *People v. Patrick J. Gorman Consultants, Inc.*, 111 Ill. App. 3d 729, 732 (1982) (improperly prosecuting and continuing to prosecute a case were quasi-judicial functions of prosecutors; therefore, prosecutors were properly afforded absolute immunity for such acts).

### 3. Procuring False Testimony from Hawes

Plaintiffs claim that Devine and Murphy "procured, induced, and encouraged" Hawes to testify falsely at the grand jury and at White's trial and Devine directed that Hawes be paid for providing such false testimony.

The amended complaint contains inconsistent allegations relating to Devine's and Murphy's knowledge that Hawes was lying. Even assuming a generous interpretation of plaintiffs' complaint, however, absolute immunity still applies.

In *Imbler*, a prosecutor was accused of knowingly using false testimony and suppressing exculpatory evidence at a defendant's trial. The Court found that the considerations underlying absolute immunity at common law dictated the same absolute immunity under 42 U.S.C. §1983. *Imbler*, 424 U.S. at 427, 47 L. Ed. 2d at 142, 96 S. Ct. at 993. Qualifying a prosecutor's immunity would disserve the broader public interest because it would prevent "vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Imbler*, 424 U.S. at 427-28, 47 L. Ed. 2d at 142, 96 S. Ct. at 993-94. Because the prosecutor's activities in initiating a prosecution and presenting the State's case were "intimately associated with the judicial phase of the criminal process," the prosecutor was immune from a civil suit for damages. *Imbler*, 424 U.S. at 430-31, 47 L. Ed. 2d at 143, 96 S. Ct. at 995.

Similarly, in *Burns*, the prosecutor allegedly suborned perjury when he participated in a probable-cause hearing. The Court held that absolute immunity for a prosecutor's actions in a probable-cause hearing was justified because appearing before a judge and presenting evidence in support of a motion for a search warrant "clearly involve the prosecutor's 'role as advocate for the State,' rather than his role as 'administrator or executive officer.' " *Burns*, 500 U.S. at 49, 114 L. Ed. 2d at 561, 111 S. Ct. at 1942. Appearing at a probable-cause hearing is " 'intimately associated with the judicial phase of the criminal process' " and is connected with the initiation and conduct of a prosecution, "particularly where the hearing occurs after arrest." *Burns*, 500

U.S. at 492, 114 L. Ed. 2d at 562, 111 S. Ct. at 1942, quoting *Imbler*, 424 U.S. at 430, 47 L. Ed. 2d at 143, 96 S. Ct. at 995.

Paying or "procuring, inducing, and encouraging" Hawes to falsely testify before the grand jury and at White's trial were acts of advocates, not investigators. Unlike in *Buckley*, where prosecutors allegedly conspired with police to manufacture false evidence that might give them probable cause to justify an arrest, the amended complaint alleges that defendants encouraged or paid for the presentation of evidence that was already established. The amended complaint does not allege that defendants sought out Hawes; rather, police had already identified and interviewed Hawes as a future witness. Furthermore, unlike in *Buckley*, the alleged subornation of perjury occurred after arrest and the determination of probable cause.

Plaintiffs seem to acknowledge that these principles apply to immunize a trial prosecutor but claim that Devine and Murphy do not enjoy absolute immunity because they were not the trial prosecutors in plaintiffs' cases. Defendants respond that Devine and Murphy were part of a "prosecution team."

In *Spiegel v. Rabinowitz*, 924 F. Supp. 883, 888 (N.D. Ill. 1996), *aff'd*, 121 F.3d 251 (1997), the court noted that prosecution is often a "joint enterprise." Preparing part of a case and "examining fact and law for another prosecutor's use is part of the prosecutor's function." *Spiegel*, 924 F. Supp. at 888.

"Assume in the midst of trial, the chief prosecutor assigns an assistant to interview a witness and recommend whether or not to call the witness. The assistant reports on what occurred and recommends calling the witness who turns out to be good for the prosecution but, in

-18-

fact, unreliable. I doubt that the assistant prosecutor is not absolutely immune." *Spiegel*, 924 F. Supp. at 888.

Therefore, because prosecution is often a "joint enterprise," Devine is absolutely immune.

Finally, plaintiffs argue that Murphy and Devine were not entitled to absolute immunity because the amended complaint alleged that they conspired with the other defendants to commit the acts alleged in the amended complaint. Plaintiffs cite *Dory v. Ryan*, 999 F.2d 679, 683 (2d Cir. 1993), and *San Filippo v. U.S. Trust Co. of New York, Inc.*, 737 F.2d 246 (2d Cir. 1984), in support. However, the *Dory* court, relying on *Buckley*'s "functional approach," modified its earlier opinion and held that a prosecutor is entitled to absolute immunity for conspiring to present false evidence at a criminal trial. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Dist. 1994) (*Dory II*). In *Dory II*, the court also limited its holding in *San Filippo* and held that it did not apply to prosecutors. *Dory II*, 25 F.3d at 82.

### B. Denial of Plaintiffs' Request to Take Depositions

Plaintiffs, citing federal law, argue that the trial court erred when it refused their request to take depositions of defendants before ruling on their motion for reconsideration. However, *Behrens v. Pelletier*, 516 U.S. 299, 306, 133 L. Ed. 2d 773, 783-84, 116 S. Ct. 834, 839 (1996), suggests that dismissal based on immunity is acceptable before the commencement of discovery. Where absolute immunity applied based on the allegations of the complaint, there was no basis for allowing depositions of defendants.

In addition, we find plaintiffs' cited authority to be distinguishable. In *Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001), the court addressed qualified, not absolute, immunity.

-19-

Furthermore, in *Forsyth v. Kleindienst*, 599 F.2d 1203, 1216 (3d Cir. 1979), the court remanded the case because the trial court failed to make an analysis or establish the reasons for its holding. Here, the trial court wrote a single-spaced, 10-page opinion analyzing the absolute immunity issue. Furthermore, *Forsyth* involved a motion for summary judgment, not a motion to dismiss. Similarly, in *Mancini v. Lester*, 630 F.2d 990, 995 (3d Cir. 1980), the court, noting that the record did not contain a reasoned explanation of the trial court's analysis, found that additional evidence may clarify the issue. In neither *Mancini* nor *Forsyth* did the courts "specifically direct lower courts on remand to permit discovery on the issue of prosecutorial immunity before entering final orders on motions to dismiss," contrary to plaintiffs' representation.

Therefore, we find that the trial court did not err when it denied plaintiffs' request to depose defendants before ruling on the motion for reconsideration.

C. Subject Matter Jurisdiction Over Defendants

We further find that this case should have been brought in the Court of Claims, as it had exclusive jurisdiction over plaintiffs' tort claims.

Article XIII, section 4, of the Illinois Constitution abolished sovereign immunity except as the General Assembly may provide by law. Ill. Const. 1970, art. XIII, §4. The Court of Claims Act provides that the Court of Claims has the "exclusive jurisdiction to hear and determine *** [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." 705 ILCS 505/8(d) (West 2004). The determination of whether an action is directed at the State depends on an analysis of the issues involved and the relief sought, rather than the formal designation of the parties. *Price v. State of*

*Illinois*, 354 Ill. App. 3d 90, 92-93 (2004). If the following factors exist, the cause of action is only nominally against the employee: (1) there are no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) the complained-of actions involve matters normally within that employee's normal and official functions of the State. *Healy v. Vaupel*, 133 Ill. 2d 295, 309 (1990).

In *Price*, this court found a prosecutor was acting within the scope of his duty when he misrepresented that a crime was a Class 1 felony, which caused the plaintiff to receive a sentence in excess of the maximum time period allowed for the offense of which he was convicted. *Price*, 354 Ill. App. 3d at 91. We adopt the reasoning in *Sneed v. Howell*, 306 Ill. App. 3d 1149 (1999), and hold that the State's Attorneys here are state employees who were acting within the scope of their employment. *Price*, 354 Ill. App. 3d at 93. Accordingly, the circuit court lacks jurisdiction over plaintiffs' claims against defendants; plaintiffs' cause of action against them may only be brought in the Court of Claims. *Price*, 354 Ill. App. 3d at 93. In *Sneed*, the prosecutor was acting within the scope of his employment when his friendship with a criminal led him to take no action against the criminal and he removed the case to a neighboring county. *Sneed*, 306 Ill. App. 3d at 1156. The court held that the Court of Claims has exclusive jurisdiction "unless the State employee exceeds the scope of his employment by violating laws or regulations of government agencies." *Sneed*, 306 Ill. App. 3d at 1156.

The amended complaint fails to allege that defendants acted beyond the scope of their authority, and the complained-of actions involve matters normally within that employee's normal

and official functions of the State. Even though plaintiffs allege that defendants were acting as investigators or administrators instead of advocates, the complained-of actions all occurred within the scope of defendants' official duties as prosecutors in the criminal cases brought by the State against plaintiffs. Plaintiffs argue that they have alleged "wrongdoing and violations of law and government regulations" and that defendants violated their independent duties as attorneys, which exist independently of their role as State employees. However, the amended complaint does not allege that defendants violated their independent duties as attorneys, nor does it specify the government regulations that defendants allegedly violated. Any of defendant's duties stem from their status as agents of the State; "unlike a physician or driver, [defendants] owed no other general duty" to plaintiffs. *Hampton*, 349 F. Supp. 2d at 1080.

## III. CONCLUSION

For the foregoing reasons, the orders of the trial court are affirmed.

QUINN, P.J., and CAMPBELL, J., concur.