2016 IL App (2d) 150646
No. 2-15-0646
Opinion filed June 30, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| LOUIS A. BIANCHI, JOYCE A. SYNEK, RONALD J. SALGADO, and MICHAEL J. McCLEARY, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 14-L-309 |
| | ) | |
| THOMAS K. McQUEEN, DANIEL JERGER, ROBERT SCIGALSKI, JAMES REILLY, PATRICK HANRETTY, RICHARD STILLING, and QUEST CONSULTANTS INTERNATIONAL, LTD., | ) ) ) ) ) ) | |
| | ) | Honorable |
| | ) | Dorothy French Mallen, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Presiding Justice Schostok and Justice Spence concurred in the judgment and opinion.

**OPINION**

¶ 1 After plaintiffs, Louis A. Bianchi, the State's Attorney of McHenry County, Illinois, and Joyce A. Synek, Ronald J. Salgado, and Michael J. McCleary, three of Bianchi's employees, were acquitted of charges brought by an assistant special prosecutor in McHenry County, they sued defendants, Thomas K. McQueen and Daniel Jerger, Robert Scigalski, James Reilly, Patrick Hanretty, Richard Stilling, and Quest Consultants International, Ltd. (collectively, Quest investigators), for malicious prosecution, intentional infliction of emotional distress, and defamation. The trial court dismissed plaintiffs' amended complaint with prejudice for lack of

subject matter jurisdiction, finding that defendants were state employees and thus entitled to sovereign immunity. Plaintiffs appeal, arguing that the trial court erred by dismissing their amended complaint, because defendants were not entitled to sovereign immunity. We reverse in part, affirm in part, and remand for further proceedings.

¶ 2                                     I. BACKGROUND

¶ 3     The following facts are taken from plaintiffs' amended complaint. In 2004, Bianchi was elected to the office of State's Attorney, and in 2008 he was reelected. In 2004 Bianchi "promptly began reforming the [office.]" This "frustrated the political operatives in McHenry County, who had obtained more favorable accommodations with the previous administration." Therefore, Bianchi acquired a few enemies. In 2006 one of the secretaries in his office, Amy Dalby, resigned and took approximately 5,000 confidential and sensitive documents with her. In October 2007, Dalby, along with Kristen Foley, a disgruntled assistant State's Attorney whom Bianchi had demoted, delivered the documents to the media and to Daniel Regna, Bianchi's opponent in the upcoming Republican primary election. In February 2008 Bianchi won the primary, which was "highly contentious and sharply divided supporters of Bianchi's reforms from the political operatives who supported Regna."

¶ 4     Bianchi learned of the document theft and asked a judge to appoint a special prosecutor to investigate. The judge obliged Bianchi, and Dalby was charged with several felonies. Dalby eventually pleaded guilty to computer tampering in June 2009. In the meantime, Regna and Dalby, aided by unnamed political enemies of Bianchi, sought the appointment of another special prosecutor, this time to investigate allegations that "Dalby performed political work" while working for the State's Attorney's office under Bianchi.[1] Judge Gordon E. Graham appointed Henry C. Tonigan III as a special State's Attorney "to investigate and/or prosecute if

---

[1] The case was assigned No. 09-MR-142.

necessary any and all persons involved in the underlying pleadings herein [pursuant to section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2008))]." The order also stated "that Attorney Thomas K. McQueen shall assist the specially appointed prosecutor, Henry C. Tonigan, III as directed by him on all matters relative to this case."

¶ 5 Tonigan and McQueen learned that the limitations period had run on Dalby's allegations. In November 2009, Tonigan "sought to expand the scope of his appointment as a special prosecutor by sending Judge Graham an *ex parte* letter." The court agreed and authorized Tonigan to investigate and prosecute "any and all persons relative to the possible misuse, misappropriation or theft of public funds, public property or public personnel by McHenry County State[']s Attorney Louis Bianchi from 2005 and thereafter." In December 2009, Tonigan retained "Quest [Consultants] to assist in the investigation of Bianchi." The court appointed Quest Consultants and its employees, including Jerger, Scigalski, Reilly, Hanretty, and Stilling, as special investigators. At all relevant times, the Quest investigators were acting within the scope of their employment with Quest Consultants.

¶ 6 McQueen conspired with the Quest investigators "to limit Tonigan's role in and knowledge of" what was actually going on. Both before and after a grand jury was convened, McQueen and the Quest investigators "manufacture[d] and fabricate[d] evidence for the purpose of removing Bianchi from office by charging and prosecuting Bianchi and [the other plaintiffs] with criminal offenses, despite the lack of probable cause or credible evidence." The manufactured and fabricated evidence was largely in the form of false witness statements. Scigalski, Reilly, and Stilling "falsely reported" that four assistant State's Attorneys (ASAs) provided them with specific statements regarding campaign activities taking place in the State's Attorney's office during Bianchi's tenure. Scigalski also "materially changed" a witness's email that originally contained exculpatory material to "exclude the exculpatory information and [he]

added manufactured inculpatory information regarding Bianchi." McQueen and Jerger learned that documents had been deleted from a computer in the State's Attorney's office due to a computer virus. However, McQueen and Jerger "deliberately concealed that exculpatory evidence from Tonigan and instead manufactured evidence in order to convince Tonigan to charge Bianchi and Synek." Synek was Bianchi's executive administrative assistant "at all times relevant." Defendants then presented the false evidence that they manufactured to the grand jury and to Tonigan, who had been "dupe[d] into bringing charges against" plaintiffs that defendants knew plaintiffs "did not commit and were not supported by probable cause."

¶ 7    The grand jury was convened, and in September 2010 Bianchi and Synek were indicted and arrested on multiple counts of official misconduct and obstruction of justice. The indictments alleged, *inter alia*, that Bianchi and Synek deleted certain computer files after receiving a grand jury subpoena to produce certain documents.

¶ 8    The indictment against Bianchi failed to allege that Bianchi committed an actual underlying crime. Therefore, McQueen and Stilling interviewed McHenry County administrator Peter Austin on October 21, 2010. Stilling and McQueen learned from Austin that McHenry County's personnel policies allowed Bianchi to use county property for personal use. However, Stilling and McQueen conspired to withhold this exculpatory evidence and, instead, fabricated Austin's witness statement, which Tonigan then relied on in deciding to present a superseding indictment to the grand jury. The grand jury returned a superseding indictment on October 22, 2010, alleging that Bianchi and Synek committed "theft of labor, services, and use of property" of McHenry County.

¶ 9    On March 23, 2011, after a two-day bench trial, Judge Joseph G. McGraw acquitted Bianchi and Synek of all charges.

¶ 10    After obtaining the indictments of Bianchi and Synek, McQueen and Scigalski began a second investigation, of Bianchi, Salgado, and McCleary, which involved the handling of criminal cases.  This investigation was not authorized by any order at the time.  So, on October 1, 2010, McQueen filed a verified petition seeking authority to expand the investigation that he had already begun.  In the petition, McQueen made false statements regarding Bianchi's allegedly improper intervention in three criminal cases, including that Bianchi: (1) "directed an ASA to reduce a plea offer to [Salgado's] nephew from five to four years"; (2) "asked an ASA to secure a recognizance bond for one of his relatives, a felony defendant, and instructed the ASA to delay the case so his relative could benefit from a diversion program which was not yet operational"; and (3) "interceded in the case of a defendant who was related to a financial supporter of Bianchi['s]."  In addition, McQueen falsely represented himself as a "Special State's Attorney." On October 1, 2010, Judge Graham signed an order granting Tonigan and McQueen the authority to investigate and prosecute individuals for using their official positions in the State's Attorney's office to give benefits in criminal prosecutions to friends, relatives, and supporters.

¶ 11    As the second investigation continued, McQueen and the Quest investigators interviewed witnesses, fabricated witness statements, and concealed exculpatory evidence "for the purpose of charging and prosecuting Bianchi and Salgado with criminal offenses, despite the lack of probable cause or competent evidence to support charges."  Defendants "manufactured and fabricated false inculpatory evidence against Bianchi and Salgado in their reports," for example: (1) Scigalski falsely reported that an ASA told him that, in the case against one of Bianchi's financial supporters, Bianchi directed the ASA to "present the victim *** with various alternatives to prosecution," such as accepting an "apology and agreement" that the financial supporter "would undergo counseling"; and (2) Scigalski falsely reported that an ASA told him that, in the case against Salgado's nephew, Bianchi told the ASA that his sentence was to be four

rather than five years and then, after sentencing, Bianchi celebrated with the nephew's family at the back of the courtroom. As a direct result of, and in reliance upon, the manufactured evidence and the concealment of the exculpatory evidence, Tonigan decided to seek indictments against Bianchi, Salgado, and McCleary.

¶ 12 Defendants presented the false and manufactured evidence to the grand jury, and on February 24, 2011, based solely upon the false evidence, the grand jury returned indictments against Bianchi, Salgado, and McCleary for official misconduct. Defendants knew that the indictments were not supported by probable cause.

¶ 13 Regarding defendants' investigation of McCleary, the complaint alleges that defendants investigated McCleary's personal use of a McHenry County vehicle that McCleary was assigned to use for his duties as an on-call investigator for the State's Attorney's office. During their investigation, defendants learned that McCleary was authorized to use the county vehicle for personal use, but defendants concealed this exculpatory information and, instead, presented misleading evidence to the grand jury, to "dupe" Tonigan into charging McCleary with official misconduct without probable cause. On February 24, 2011, McQueen made false statements to the grand jury that (1) McCleary had asserted his fifth amendment rights and had refused to answer whether he had reimbursed the county for gas mileage and expenses; and (2) McQueen had issued subpoenas for documents showing that McCleary had reimbursed the county for gas mileage and expenses and no such documents were produced.

¶ 14 Tonigan had no knowledge that defendants had manufactured inculpatory evidence or concealed exculpatory evidence during their second investigation. Defendants used false evidence, manufactured witness statements, and concealed exculpatory information to convince Tonigan to bring charges against Bianchi, Salgado, and McCleary, though defendants knew that the charges were not supported by probable cause. In reliance on the false and manufactured

evidence, Tonigan decided to bring charges against Bianchi, Salgado, and McCleary, and in February 2011 the grand jury returned indictments against Bianchi, Salgado, and McCleary.

¶ 15    On February 28, 2011, McQueen held a press conference during which he knowingly made false and inflammatory statements about Bianchi, Salgado, and McCleary in order to tarnish the public's opinion of Bianchi.

¶ 16    In June 2011, Judge McGraw dismissed the indictments against Salgado and McCleary, and in August 2011, after a bench trial, Bianchi was acquitted of all charges.

¶ 17    On January 18, 2012, plaintiffs filed against defendants a complaint in the United States District Court for the Northern District of Illinois, alleging violations of their rights under the first, fourth, and fourteenth amendments to the United States Constitution and claims under state law for malicious prosecution, intentional infliction of emotional distress, and defamation.[2] The district court dismissed the federal claims with prejudice, finding that plaintiffs failed to plead a constitutional injury, because, *inter alia*, the fabrication of evidence did not result in plaintiffs' wrongful incarceration or conviction. However, the court ruled that plaintiffs could bring their state law claims in state court. This decision was affirmed. *Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016).

¶ 18    On March 26, 2014, plaintiffs filed an eight-count complaint against defendants, alleging malicious prosecution, intentional infliction of emotional distress, and defamation. Counts I, II, and III alleged malicious prosecution, against all defendants, regarding plaintiff's detention, arrest, and prosecution. Counts IV, V, VI, and VII alleged intentional infliction of emotional distress, against all defendants. In count VIII, Bianchi, Salgado, and McCleary alleged defamation, against McQueen.

---

[2] Case No. 12-cv-00364.

¶ 19    On January 29, 2015, the trial court dismissed the complaint without prejudice, pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure  (Code) (735 ILCS 5/2-615, 2-619 (West 2014)), for failure to state a cause of action and lack of subject matter jurisdiction based on sovereign immunity.  In its written order dismissing the complaint, the trial court found that (1) defendants were state employees and thus entitled to sovereign immunity; (2) no exception to sovereign immunity applied; and (3) the complaint failed to state a cause of action for malicious prosecution.

¶ 20    On March 12, 2015, plaintiffs filed a first amended complaint (complaint), alleging the same causes of action contained in the original complaint and making additional allegations. The complaint additionally alleged that, "[a]ccording to the State of Illinois, during the conduct alleged in this lawsuit, Quest and the Quest Investigators were not 'employees' as defined by Section 1(b) of the State Employee Indemnification Act, 5 ILCS 350/.01 *et seq*.  See April 9, 2012 Letter, attached as exhibit A."  It further alleged that the State of Illinois did not have a policy encouraging its employees to engage in intentional torts and that Judge McGraw had determined in the underlying criminal proceeding that McQueen abused his authority by wrongfully prosecuting innocent people and that McQueen's intent was to embarrass Bianchi and his staff and subject him to scorn and ridicule.

¶ 21    On April 16, 2015, defendants filed separate hybrid motions to dismiss the complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2014)).  The motions relied on the same bases for dismissal.  Defendants asserted that plaintiffs' claims should be dismissed pursuant to section 2-619(a)(1) of the Code (735 ILCS 5/2-619(a)(1) (West 2014)), arguing that the Court of Claims had exclusive jurisdiction because defendants were state employees and thus were entitled to sovereign immunity.  Defendants also asserted that all of plaintiffs' claims were barred by common-law immunity and quasi-judicial immunity and therefore should be dismissed

pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2014)). Further, defendants argued that plaintiffs' claims were barred by assignment of their recovery to McHenry County and thus should be dismissed pursuant to section 2-619(a)(9). Finally, defendants asserted that the claims should be dismissed pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)), because plaintiffs failed to state a claim for malicious prosecution, intentional infliction of emotional distress, defamation, or conspiracy.

¶ 22    On June 4, 2015, the trial court dismissed plaintiffs' complaint with prejudice for lack of subject matter jurisdiction. Plaintiffs filed their notice of appeal on June 24, 2015.

¶ 23                                  II. ANALYSIS

¶ 24    Defendants' motions to dismiss were brought under section 2-619.1 of the Code, which allows a party to file a motion combining a section 2-615 motion to dismiss with a section 2-619 motion to dismiss. See 735 ILCS 5/2-619.1 (West 2014). A section 2-615 motion tests the legal sufficiency of a complaint. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. A section 2-619 motion admits the sufficiency of the complaint but asserts a defense outside the complaint that defeats it. *Id*. When ruling on a section 2-615 or section 2-619 motion, a court must accept all well-pleaded facts as true and accord all reasonable inferences to the nonmoving party. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶¶ 18, 47. When ruling on a section 2-615 or section 2-619 motion, a court interprets all pleadings and supporting documents in the light most favorable to the nonmoving party. *Id.* We review *de novo* a trial court's decision on a motion pursuant to section 2-615 or section 2-619. See *id*. Moreover, we may affirm a dismissal order on any basis supported by the record, regardless of the reason given by the trial court. See *BDO Seidman, LLP v. Harris*, 379 Ill. App. 3d 918, 923 (2008).

¶ 25                    A. Dismissal Based on Section 2-619 of the Code

¶ 26    In this case, the trial court dismissed plaintiffs' complaint pursuant to section 2-619(a)(1) of the Code. The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proven issues of fact at the outset of litigation. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). A section 2-619(a)(1) motion asserts a lack of subject matter jurisdiction. 735 ILCS 5/2-619(a)(1) (West 2014).

¶ 27                                    1. Sovereign Immunity

¶ 28    Plaintiffs argue that the trial court erred by dismissing their complaint for lack of subject matter jurisdiction. Plaintiffs argue that the Court of Claims does not have exclusive jurisdiction over their claims, because defendants are not entitled to sovereign immunity.

¶ 29    The doctrine of sovereign immunity was abolished in Illinois by the 1970 Constitution, "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4. In 1972, the General Assembly passed the State Lawsuit Immunity Act. See Pub. Act 77-1776, § 1 (eff. Jan. 1, 1972), now codified as 745 ILCS 5/0.01 *et seq.* (West 2014). Section 1 of the State Lawsuit Immunity Act provides that, except as provided in the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2014)) and other specified statutes, "the State of Illinois shall not be made a defendant or party in any court" (745 ILCS 5/1 (West 2014)). The Court of Claims Act provides that the Court of Claims possesses exclusive jurisdiction to hear and determine various matters, including "[a]ll claims against the *State* for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." (Emphasis added.) 705 ILCS 505/8(d) (West 2014).

¶ 30    Plaintiffs argue that their complaint does not assert a claim against the state, because defendants are not state employees. Plaintiffs contend that McQueen is a "private attorney" being sued in his individual capacity and that he was appointed and paid by McHenry County. Regarding the Quest investigators, plaintiffs note that the Attorney General of Illinois refused to

defend and indemnify them. Defendants respond that the Attorney General's decision is not dispositive on this issue.

¶ 31 We agree with defendants that the Attorney General's decision does not determine whether the Court of Claims has exclusive jurisdiction over this case. See *Healy v. Vaupel*, 133 Ill. 2d 295, 317 (1990) (stating, "we do not believe that the Attorney General's decision whether to represent a defendant in an action can be said to determine the proper forum for [a] claim").

¶ 32 Next, plaintiffs argue that defendants are not state employees, because they were not appointed as special State's Attorneys pursuant to section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2014)). Defendants respond that (1) the Court of Claims has exclusive jurisdiction over this action because, notwithstanding the formal designation of the parties, once appointed, a special State's Attorney is a servant or agent of the state and meets the definition of "state employee" under section 1(b) of the State Employee Indemnification Act (5 ILCS 350/1(b) (West 2014)); and (2) plaintiffs' lawsuit seeks to control the actions of the state.

¶ 33 The formal identification of the parties as they appear in the record is not dispositive of whether jurisdiction lies exclusively in the Court of Claims. *Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶ 44. Therefore, a plaintiff cannot evade the prohibition against making the state a party to a lawsuit by filing an action against a servant or agent of the state if the claim is really against the state. *Id*.

¶ 34 The Illinois Supreme Court has held that State's Attorneys and ASAs are state officials. *Ingemunson v. Hedges*, 133 Ill. 2d 364, 367 (1990). Further, section 1(b) of the State Employee Indemnification Act provides:

"The term 'employee' means: any present or former elected or appointed officer, trustee or employee of the State ***. *** An individual who renders professional advice and consultation to the State through an organization which qualifies as an "employee" under

the Act is also an employee. The term includes the estate or personal representative of an employee." 5 ILCS 350/1(b) (West 2014).

¶ 35 The record clearly establishes that on September 18, 2009, Judge Graham appointed McQueen as a special prosecutor pursuant to section 3-9008 of the Counties Code. This appointment was reiterated on October 1, 2010. Further, both McQueen and the Quest investigators meet the definition of "employee" pursuant to section 1(b) of the State Employee Indemnification Act. In addition, as McQueen notes, Bianchi and Synek are judicially estopped from asserting that McQueen was not appointed as a special prosecutor, because they took the opposite position in a prior proceeding. Bianchi and Synek admitted in a motion to dismiss the indictments filed against them that McQueen was appointed "as special prosecutor pursuant to 55 ILCS 5/3-9008." Accordingly, we determine that defendants were state employees.

¶ 36 However, this does not end our inquiry, because the doctrine of sovereign immunity " 'affords no protection *** when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court.' " *Leetaru*, 2015 IL 117485, ¶ 45 (quoting *Healy*, 133 Ill. 2d at 308). When it is alleged that a state employee acted illegally, unconstitutionally, or under authority that he or she did not have, the employee's conduct is not considered that of the state for purposes of sovereign immunity. *Id.* ¶ 46.

¶ 37 Not every legal wrong committed by an employee of the state triggers this exception to sovereign immunity. *Id.* ¶ 47. For example, the exception is inapplicable where a state official merely exercises the authority delegated to him erroneously. *Id.* The exception is aimed at situations where the state employee is not doing the business that the sovereign has empowered him or her to do or is doing it in a way that the law forbids. *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d 250, 266 (2005). The purpose of the doctrine of sovereign immunity, after all, is

to "protect[] the State from interference in its performance of the functions of government and preserve[] its control over State coffers." *S.J. Groves & Sons Co. v. State*, 93 Ill. 2d 397, 401 (1982).

¶ 38    With this in mind, the state cannot justifiably claim interference with its functions when the conduct complained of is unauthorized or illegal. *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 188 (1984). Thus, an action is not against the state when there are "allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts." See *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990).

¶ 39    Plaintiffs argue that the trial court has subject matter jurisdiction of their claims, because defendants are alleged to have committed intentional torts, acted maliciously, and acted in excess of their authority.

¶ 40    In *Loman v. Freeman*, 229 Ill. 2d 104 (2008), the supreme court held that the Court of Claims did not have exclusive jurisdiction of a claim that a state employee committed conversion. *Id*. at 129. Regarding the issue involved, the court explained that "[t]he essence of a claim for conversion is an allegation that the defendant engaged in an intentional, wrongful act." *Id*. Regarding the relief sought, the court explained that holding the defendant liable for conversion would not operate to control the state, because the defendant's employer, the University of Illinois, could not have a policy requiring its employees to commit conversion. *Id*.

¶ 41    In this case, plaintiffs alleged that during their investigations defendants (1) "presented Tonigan with manufactured inculpatory evidence"; (2) manufactured and fabricated "evidence for the purpose of removing [Bianchi] from office" by prosecuting him and other employees despite the lack of probable cause or credible evidence; and (3) "prepared reports that contained false and manufactured evidence." The complaint also alleges specific instances where defendants fabricated evidence against plaintiffs. Defendants then presented that false evidence

that they manufactured to the grand jury and to Tonigan, who had been "dupe[d] into bringing charges against" plaintiffs that defendants knew plaintiffs "did not commit and were not supported by probable cause." Taking the allegations as true, which we must do for purposes of this appeal (see *Barber v. American Airlines, Inc.*, 241 Ill. 2d 450, 455 (2011)), the alleged deliberate investigative fraud must certainly be outside defendants' authority as employees of the state. These allegations are sufficient to establish that defendants acted in excess of their authority and in violation of applicable laws such that the Court of Claims does not have exclusive jurisdiction over plaintiffs' tort claims.

¶ 42 Further, a judgment for plaintiffs would not operate to control the actions of the state or subject it to liability. See *Loman*, 229 Ill. 2d at 113. This is so because the state has no policy of encouraging its employees to engage in malicious prosecution, intentional infliction of emotional distress, or defamation in the manner alleged in plaintiffs' complaint. Thus, a judgment for plaintiffs could not operate to restrain state employees' performance of their lawful duties. See *Loman*, 229 Ill. 2d at 129. Nor would a judgment for plaintiffs subject the state to liability, because defendants were denied indemnification by the Attorney General. Even if the state had indemnified defendants for any judgment entered against them as a result of their state employment, such indemnification would not amount to the state being "subjected to liability." *Id.* at 122 (explaining that indemnification is not the same as liability and rejecting the argument that indemnification of a state employee requires a suit to be brought in the Court of Claims). Because sovereign immunity affords no protection when employees of the state have acted in violation of statutory or constitutional law or in excess of their authority, which is precisely what plaintiffs here have alleged, plaintiffs were entitled to proceed in circuit court. See *Leetaru*, 2015 IL 117485, ¶ 50. Accordingly, we determine that the trial court erred by dismissing plaintiffs' complaint for lack of subject matter jurisdiction.

¶ 43    The Quest investigators argue that their actions during their investigations were conducted solely "within the scope [of their] official duties as [investigators] in the criminal cases brought by the State against plaintiffs." The Quest investigators quote *White v. City of Chicago*, 369 Ill. App. 3d 765, 779-80 (2006), to support their argument.

¶ 44    In *White*, the plaintiffs alleged that attorneys from the State's Attorney's office failed to disclose exculpatory evidence and elicited false testimony from a witness. *Id*. at 767-68. The appellate court held that the Court of Claims had exclusive jurisdiction of the plaintiffs' tort claims of wrongful imprisonment, intentional infliction of emotional distress, and conspiracy, because the defendants were acting within their prosecutorial role. *Id*. at 769, 778. In this case, by contrast, defendants are alleged to have knowingly manufactured and fabricated evidence. Thus, *White* is distinguishable from this case.

¶ 45    The Quest investigators argue that their responsibilities in their investigations arose from their employment with the state. They cite *Price v. State*, 354 Ill. App. 3d 90 (2004), and *Sneed v. Howell*, 306 Ill. App. 3d 1149 (1999), to support their argument. In *Price*, the plaintiff alleged that during sentencing the prosecutor misrepresented that the plaintiff's crime was a Class 1 felony, which caused the plaintiff to receive a sentence in excess of the maximum allowed for the offense. *Price*, 354 Ill. App. 3d at 91. The appellate court held that the prosecutor was "a state employee who was acting in the scope of his employment during sentencing." *Id*. at 93. Nothing in *Price* indicates that the plaintiff alleged that the prosecutor acted intentionally or with malice. In this case, plaintiffs allege that defendants acted intentionally and with malice. Therefore, *Price* is distinguishable from the case at bar.

¶ 46    In *Sneed*, the plaintiff alleged that she was the administrator of the estate of a woman who was murdered by her ex-husband. Two weeks before her death, the decedent told the police that her ex-husband was stalking and harassing her. *Sneed*, 306 Ill. App. 3d at 1152. The ex-

husband was not then prosecuted and thereafter he killed the decedent. *Id*. The plaintiff alleged negligence and willful and wanton misconduct by the Jefferson County State's Attorney. *Id*. at 1151. The plaintiff alleged that the State's Attorney's friendship with the ex-husband led him to negligently perform his duties by taking no action and by removing the case to a different county's State's Attorney's office. *Id*. at 1152-53. The appellate court held that the State's Attorney acted within the scope of his employment and that therefore he was a state employee for purposes of the Court of Claims Act. *Id*. at 1156. The appellate court concluded that "removing [the] case to a neighboring county because of a personal connection, to ensure a proper investigation and possible prosecution, [was] a prudent course of action." *Id*. In this case, plaintiffs alleged that defendants committed intentional malicious acts beyond the scope of their discretion as state employees. Therefore, *Sneed* is distinguishable from the case at bar.

¶ 47 McQueen argues that plaintiffs failed to allege that he acted outside the scope of his authority, because plaintiffs failed to allege malice. McQueen contends that, in order to plead malice, plaintiffs were required to allege, with specific facts, that McQueen was motivated by malice. McQueen cites *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345 (2001), to support his argument.

¶ 48 In *Welch*, the plaintiff alleged that the defendant, a state employee, was not entitled to sovereign immunity, because he acted with malice and therefore acted outside the scope of his state authority. *Id*. at 354. The supreme court stated that the facts alleged were "consistent with an intent to further the business of the Illinois Supreme Court and thus can be considered within the scope of employment." *Id*. In this case, plaintiffs alleged that defendants fabricated evidence, concealed exculpatory evidence, and "duped" Tonigan into charging plaintiffs where there was a lack of probable cause. In no way can these facts be considered consistent with the intent to further the business of Illinois. Therefore, *Welch* is distinguishable from this case.

¶ 49                                    2. Absolute Immunity

¶ 50    McQueen argues that absolute prosecutorial immunity bars plaintiffs' action.  Although the trial court dismissed on other grounds, we may affirm the trial court on any basis supported by the record.  *BDO Seidman*, 379 Ill. App. 3d at 923.  Therefore, we will discuss McQueen's alternative grounds for affirming the trial court's judgment.

¶ 51    McQueen contends that absolute immunity applies to his conduct in preparing for the initiation of the criminal process, his statements and conduct before the grand jury, and his witness interviews.  McQueen also argues that absolute immunity applies to plaintiffs' allegations that he suppressed evidence, failed to produce evidence, and presented false testimony.  McQueen contends that plaintiffs cannot circumvent absolute immunity by labeling McQueen's actions as "investigative."  McQueen contends that the only witness plaintiffs alleged McQueen interviewed was Peter Austin and that this interview occurred after the indictment was returned.

¶ 52    The burden to prove that immunity exists is on the party seeking the immunity.  *White*, 369 Ill. App. 3d at 769 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  The United States Supreme Court has adopted a "functional approach," which analyzes the nature of the function performed, rather than the identity of the actor who performed it.  *Buckley*, 509 U.S. at 269.  Therefore, a prosecutor is entitled to absolute immunity for acts undertaken in his role as an *advocate* for the state in preparing for the initiation of judicial proceedings or for trial.  *Id*. at 273.  These acts include the evaluation of evidence assembled by the police and the "appropriate preparation for its presentation" before a grand jury or at trial "after a decision to seek an indictment has been made."  *Id*.  A police officer or detective's role is to *investigate* or to search for "the clues and corroboration that might give him probable cause to recommend that a suspect be arrested."  *Buckley*, 509 U.S. at 273.  However, a prosecutor is not entitled to absolute

immunity when he performs the investigative functions normally performed by a police officer or detective. *Id*. at 274.

¶ 53 For example, in *Buckley*, the Supreme Court held that prosecutors were not entitled to absolute immunity where they allegedly fabricated evidence during an investigation before there was probable cause to arrest the petitioner. *Id.* at 276-78. In *Buckley*, the petitioner, a former murder defendant, alleged that prosecutors conspired with police detectives to manufacture false evidence that linked the petitioner's boot with a boot print found at the scene of the crime. *Id*. at 263, 272. The Court looked to the allegations in the complaint regarding the "conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime." *Id*. at 274. The Court held that the prosecutors were not functioning as "advocates" when they allegedly fabricated the false boot print. *Id*. The Court reasoned that the prosecutors' mission was entirely investigative, because they did not have probable cause to arrest the petitioner or to initiate judicial proceedings during that period. *Id*.

¶ 54 This case is similar to *Buckley*, because plaintiffs' complaint alleges that McQueen fabricated and manufactured evidence before there was probable cause to convene the grand jury or to indict or arrest plaintiffs. For example, plaintiffs alleged that McQueen "directed" the Quest investigators "to conduct certain interviews for the purpose of manufacturing and fabricating evidence." Further, they alleged that, "at the direction" of McQueen, the Quest investigators prepared false and manufactured evidence, including that (1) four ASAs provided defendants with specific statements regarding campaign activities taking place in the State's Attorney's office during Bianchi's tenure, (2) Bianchi directed an ASA to reduce the sentence in a plea offer to Salgado's nephew, (3) Bianchi asked an ASA to secure a recognizance bond for one of Bianchi's relatives, a felony defendant, and instructed the ASA to delay the case so his relative could benefit from a diversion program that was not yet operational; and (4) Bianchi

interceded in the case of a defendant who was related to a financial supporter of Bianchi's. Because plaintiffs alleged that McQueen undertook these actions in the absence of probable cause, and before the grand jury was convened, McQueen's mission was entirely investigative. Therefore, McQueen is not entitled to absolute immunity. See *id.*

¶ 55    Quoting *White*, McQueen argues that, like the State's Attorney in *White*, he is "absolutely immune for directing the investigations." *White*, 369 Ill. App. 3d at 776. In *White*, the plaintiffs alleged that, one to two years after their arrests and indictments, the State's Attorney directed his office to investigate a double homicide. *Id.* Although the investigation revealed exculpatory evidence, the plaintiffs remained in custody. *Id.* In this case, plaintiffs alleged that McQueen prepared and manufactured false evidence before the grand jury was convened and in the absence of probable cause. Accordingly, *White* is distinguishable from this case. Indeed, in *White* the appellate court distinguished *Buckley* by stating that in *Buckley* "prosecutors allegedly conspired with police to manufacture false evidence that might give them probable cause to justify an arrest." *Id*. at 777.

¶ 56    Citing *Rehberg v. Paulk*, 566 U.S. ___, 132 S. Ct. 1497 (2012), McQueen argues that he "enjoys absolute immunity for his witness interviews." In *Rehberg*, the petitioner sought damages under section 1983 (42 U.S.C. § 1983 (2006)), alleging that the respondent, the chief investigator employed by the district attorney's office, falsely testified before the grand jury. *Rehberg*, 566 U.S. at ___, 132 S. Ct. at 1501. The Supreme Court held that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." *Id.* at ___, 132 S. Ct. at 1506. McQueen reads *Rehberg* too broadly and plaintiffs' complaint too narrowly. Most notably, McQueen overlooks that the Supreme Court declined to extend absolute immunity to all activity that a witness conducts outside of a grand jury room, such as where a law enforcement official fabricates evidence concerning an unsolved crime. *Id*. at ___ n.1, 132 S. Ct.

at 1506 n.1.  Thus, the fact that McQueen testified before the grand jury regarding his allegedly fabricated evidence does not shield him from plaintiffs' malicious-prosecution claims.  Because plaintiffs alleged that McQueen fabricated evidence in the absence of probable cause, prior to the convening of the grand jury, this case is distinguishable from *Rehberg*.

¶ 57                                    3. Quasi-Judicial Immunity

¶ 58    Next, McQueen argues that plaintiffs' claims against him are barred by quasi-judicial immunity because he was authorized by Judge Graham's September 18, 2009, order to investigate allegations of wrongdoing.

¶ 59    Judges are absolutely immune from liability for suits arising out of their performance of judicial functions.  *Mireles v. Waco*, 502 U.S. 9, 13 (1991) (*per curiam*).  The absolute immunity afforded to judges has been extended to apply to nonjudges in two circumstances.  First, it has been applied to "quasi-judicial conduct" of "[n]on-judicial officials whose official duties have an integral relationship with the judicial process."  *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986).  These officers' conduct is "functionally comparable" to that of judges.  *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993).  As the Supreme Court has explained, "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function."  *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976)).

¶ 60    Second, the absolute immunity afforded to a judge has been applied to a judge's subordinate who undertakes more administrative functions pursuant to a judge's explicit direction.  *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992).

¶ 61    McQueen argues that he is entitled to the second category of quasi-judicial immunity, pursuant to Judge Graham's order authorizing Tonigan and McQueen to "investigate and

prosecute." However, nothing in Judge Graham's order authorized McQueen to commit the misconduct alleged by plaintiffs. Certainly, McQueen does not contend that Judge Graham authorized McQueen to fabricate or manufacture evidence against plaintiffs to create probable cause. Accordingly, we must conclude that, on this record, there is no basis for dismissal of plaintiffs' complaint on the ground of quasi-judicial immunity.

¶ 62    McQueen cites *Kincaid* and *Henry* to support his argument. Those cases are distinguishable from this case because in those cases nothing indicates that the defendants did anything more than perform acts as authorized by judges. See *Kincaid*, 969 F. 2d at 601 (holding that court clerks were entitled to quasi-judicial immunity for returning a complaint and filing fee to the plaintiffs pursuant to a judge's direction); *Henry*, 808 F.2d at 1239-40 (holding that a police chief was entitled to quasi-judicial immunity for placing property in possession of a bank pursuant to a court order).

¶ 63                                    4. Assignment

¶ 64    McQueen argues that Bianchi's and Synek's claims are barred because they assigned to McHenry County their rights to recover damages against defendants. This argument lacks merit because the record clearly indicates that Bianchi and Synek did not assign their rights to recover damages against defendants. Rather, Bianchi and Synek agreed to reimburse McHenry County for attorney fees up to $275,000. Therefore, Bianchi's and Synek's claims are not barred.

¶ 65              B. Dismissal Based on Section 2-615 of the Code

¶ 66    Having determined that the trial court erred by dismissing plaintiffs' complaint for lack of subject matter jurisdiction based on sovereign immunity, we now address defendants' arguments regarding plaintiffs' failure to state any cause of action.

¶ 67    When reviewing the legal sufficiency of a claim under section 2-615, the inquiry is whether the allegations of the complaint, when construed in the light most favorable to the

plaintiff, and taking as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts, are sufficient to establish a cause of action upon which relief may be granted. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305 (2008). Exhibits attached to a complaint become part of the pleading for a motion to dismiss. *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 18. At this pleading stage, a plaintiff is not required to prove his case and need only allege sufficient facts to state all elements of the cause of action. *Fox v. Seiden*, 382 Ill. App. 3d 288, 294 (2008). A section 2-615 motion to dismiss should not be granted "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155, 161 (2009).

¶ 68                                    1. Malicious Prosecution

¶ 69    Defendants argue that plaintiffs failed to sufficiently plead facts to establish a cause of action for malicious prosecution.

¶ 70    To state a claim for malicious prosecution, a plaintiff must allege facts showing: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) malice; and (5) damages. *Grundhoefer v. Sorin*, 2014 IL App (1st) 131276, ¶ 11. In this case, defendants argue that plaintiffs' complaint fails to sufficiently plead facts to establish all but the damages element of malicious prosecution.

¶ 71    The Quest investigators argue that the complaint fails to allege that they were responsible for commencing or continuing the prosecution, because the prosecution was "well under way" before the Quest investigators were retained and before the Quest investigators could have done the things plaintiffs alleged they did. Further, the Quest investigators contend that plaintiffs' complaint contains nothing more than mere allegations unsupported by facts.

¶ 72    Liability in a malicious-prosecution case extends to all persons who played a significant role in causing the prosecution of the plaintiff. *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 348 (2000).

¶ 73    In this case, plaintiffs pleaded sufficient facts to establish that defendants played a significant role in causing the prosecution of plaintiffs. Plaintiffs alleged specific instances of defendants' fabricating witnesses' statements and other evidence against plaintiffs. Plaintiffs further alleged that defendants presented this false evidence to the grand jury and to Tonigan for the purpose of causing plaintiffs to be prosecuted. Plaintiffs also alleged that defendants used the false evidence that they manufactured to "dupe Tonigan into bringing charges against" plaintiffs that defendants knew plaintiffs "did not commit and were not supported by probable cause." Further, plaintiffs alleged that, as a direct result of defendants' false evidence, Tonigan made the decision to bring charges against plaintiffs. When these allegations are viewed in the light most favorable to plaintiffs, plaintiffs have alleged facts sufficient to establish that defendants were responsible for commencing or continuing the prosecution of plaintiffs.

¶ 74    Next, defendants argue that plaintiffs failed to plead facts demonstrating a lack of probable cause, because Dalby's affidavit, filed in support of her petition seeking the appointment of a special State's Attorney, established probable cause. Defendants note that, after reviewing Dalby's affidavit, Judge Graham found that "sufficient facts have been alleged to support [that] a prosecution may result from the investigation." In addition, McQueen argues that plaintiffs failed to plead facts demonstrating a lack of probable cause because plaintiffs were indicted by a grand jury.

¶ 75    Probable cause has been defined in a malicious-prosecution case involving criminal proceedings as a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the

offense charged. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641 (2003). In a malicious-prosecution action, the existence of probable cause is determined by looking to what the defendants knew when a criminal complaint was issued and not at an earlier time. *Gauger v. Hendle*, 2011 IL App (2d) 100316, ¶ 112. "Prima facie probable cause is established by the return of the indictment by the grand jury but it is not conclusive evidence of probable cause." (Internal quotation marks omitted.) *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 296 (1965). "It may be rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Id.* "The existence of probable cause is a mixed question of law and fact." *Fabiano*, 336 Ill. App. 3d at 642. "Whether the circumstances alleged to show probable cause are true is a question of fact, but, if true, whether those circumstances amount to probable cause is a question of law to be decided by the court." *Id*.

¶ 76 In this case, plaintiffs alleged that defendants fabricated evidence and that the grand jury's decision to indict plaintiffs was based solely upon that fabricated evidence and false testimony. See *Freides*, 33 Ill. 2d at 296. The facts alleged in plaintiffs' complaint support a reasonable inference that, when defendants "duped" Tonigan into bringing charges against plaintiffs, defendants did not have an honest belief that plaintiffs were guilty of any offense. Therefore, for purposes of a section 2-615 motion to dismiss, plaintiffs' complaint alleges sufficient facts to establish that defendants lacked probable cause for the indictment.

¶ 77 McQueen cites *Kaley v. United States*, 571 U.S. ___, 134 S. Ct. 1090 (2014), to support his argument. In *Kaley*, the United States Supreme Court held that the defendants were not entitled to a pretrial hearing to challenge the grand jury's probable-cause determination after the federal government restrained their assets. *Id*. at ___, 134 S. Ct. at 1095. *Kaley* has no

application to this case where we are asked to determine whether plaintiffs pleaded facts sufficient to establish that there was no probable cause for purposes of a malicious-prosecution claim.

¶ 78    The Quest investigators also argue that plaintiffs failed to allege facts sufficient to establish malice, because, as the trial court observed in its dismissal of plaintiffs' original complaint, "no factual nexus is [pleaded] between the conspiracy of Bianchi's political enemies and [defendants]."  Plaintiffs respond that their complaint alleges sufficient facts to establish malice, because the facts clearly establish that defendants' intent was not to seek justice. Therefore, according to plaintiffs, it can be reasonably inferred from the facts alleged that defendants acted with malice.

¶ 79    "Malice" in the context of malicious prosecution is defined as the actuation of a prosecution for an improper motive.  *Rodgers*, 315 Ill. App. 3d at 349.  An improper motive for a prosecution is any reason other than to bring the party to justice.  *Id.*  Malice may be inferred from a lack of probable cause only where there is no credible evidence that refutes that inference. *Gauger*, 2011 IL App (2d) 100316, ¶ 122.

¶ 80    In this case, plaintiffs pleaded facts establishing that defendants intentionally fabricated inculpatory evidence and concealed exculpatory evidence, knowing that there was no probable cause to bring charges against plaintiffs.  Accepting as true the well-pleaded facts in plaintiffs' complaint and the reasonable inferences that may be drawn from those facts, and construing the allegations in the complaint in the light most favorable to plaintiffs, plaintiffs' complaint sufficiently alleges malice for purposes of their malicious-prosecution claim.

¶ 81                    2. Intentional Infliction of Emotional Distress

¶ 82    McQueen argues that plaintiffs failed to sufficiently plead facts necessary to establish a claim for intentional infliction of emotional distress.  To properly plead a cause of action for

intentional infliction of emotional distress, a plaintiff must allege facts to establish: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 20 (1992).

¶ 83 McQueen contends that plaintiffs failed to plead extreme and outrageous conduct. Our supreme court has warned that "mere insults, indignities, threats, annoyances, petty oppressions or trivialities" do not constitute extreme and outrageous conduct. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90 (1976). "Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas*, 154 Ill. 2d at 21. In determining whether conduct is extreme and outrageous, courts use an objective standard based on all the facts and circumstances of the case. *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 36. In *McGrath v. Fahey*, 126 Ill. 2d 78, 86-90 (1988), the supreme court identified several factors that may be considered in determining whether a defendant's conduct is extreme and outrageous. Regarding the first *McGrath* factor, the court stated, "the degree of power or authority which a defendant has over a plaintiff can impact *** whether that defendant's conduct is outrageous," and the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *Id.* at 86-87. Such an abuse of power has been found where the defendants exercised great economic leverage over a plaintiff and attempted to defraud that plaintiff out of millions of dollars (see *id.*) or where a police officer abused his position of power by berating a sexual-assault victim and refusing to save her children from attack (see *Doe v. Calumet City*, 161 Ill. 2d 374 (1994)).

¶ 84    In this case, plaintiffs alleged that defendants fabricated and manufactured evidence and concealed exculpatory evidence for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause.  These allegations regarding defendants' abuse of power are sufficiently "extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community."  *Kolegas*, 154 Ill. 2d at 21.  Thus, plaintiffs sufficiently pleaded the first element of intentional infliction of emotional distress.

¶ 85    McQueen cites *Schiller v. Mitchell*, 357 Ill. App. 3d 435 (2005), to support his contention that a criminal investigation and prosecution that results in an acquittal is not extreme and outrageous conduct.  In *Schiller*, the plaintiffs alleged that the defendants, members of a homeowners' association, videotaped the plaintiffs and complained to the police, causing police investigations and prosecutions of the plaintiffs.  *Id*. at 447.  However, in *Schiller*, the defendants' complaints "were false or baseless."  *Id*. at 449.  In contrast to *Schiller*, in this case, plaintiffs alleged that defendants fabricated and manufactured evidence that resulted in plaintiffs' arrests and prosecutions.  Further, in this case, defendants were the special prosecutor and the investigators for the special prosecutor, whereas, in *Schiller*, the defendants were civilians and thus their power was not as great as that of defendants in this case.  See *id*.  For these reasons, *Schiller* is distinguishable from this case.

*¶ 86*    Next, McQueen argues that plaintiffs failed to sufficiently plead that they suffered severe emotional distress as a result of defendants' conduct.  To satisfy this third element of the cause of action, a plaintiff must plead facts to establish that the severity of the emotional distress was so great that " 'no reasonable man could be expected to endure it.' "  *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 276 (2003) (quoting Restatement (Second) of Torts § 46 (1965)).  Emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation,

embarrassment, anger, chagrin, disappointment, worry, and nausea. See Restatement (Second) of Torts § 46, cmt. j, at 77 (1965). However, the facts alleged in support of the extreme and outrageous character of a defendant's conduct may be sufficient to support the additional allegation that a plaintiff suffered severe emotional distress as a result of that conduct. *Kolegas*, 154 Ill. 2d at 25 (" 'Severe emotional distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.' " (quoting Restatement (Second) of Torts § 46, cmt. j, at 77-78 (1965)). In this case, we determine that the facts alleged by plaintiffs to support the extreme and outrageous character of defendants' conduct was sufficient to support the third requirement of intentional infliction of emotional distress. See *id.*

¶ 87 McQueen cites *Public Finance Corp. v. Davis*, 66 Ill. 2d 85 (1976), *Kynsak v. Shelter Life Insurance Co.*, 273 Ill. App. 3d 360 (1995), *Khan v. American Airlines*, 266 Ill. App. 3d 726 (1994), and *Farnor v. Irmco Corp.*, 73 Ill. App. 3d 851 (1979), to support his argument. However, unlike plaintiffs in this case, the plaintiffs in the cases McQueen cites failed to plead extreme and outrageous conduct. See *Public Finance*, 66 Ill. 2d at 92 (holding that an agent for the plaintiff's creditor did not act in an extreme and outrageous manner by repeatedly calling the plaintiff and coming to her home); *Kynsak*, 273 Ill. App. 3d at 370 (holding that a health insurance company's denial of a claim for treatment of the plaintiff's wife's illness was not extreme or outrageous); *Kahn*, 266 Ill. App. 3d at 733 (holding that an airline's and security agents' entrapment of the plaintiff and keeping him from his father's funeral did not go beyond all possible bounds of decency); *Farnor*, 73 Ill. App. 3d at 856 (holding that a landlord's rude comments and refusal to allow the plaintiff to use a freight elevator were not extreme and outrageous conduct). Accordingly, the cases McQueen cites are distinguishable from this case.

¶ 88                                  3. Defamation

¶ 89    McQueen argues that plaintiffs failed to sufficiently plead facts necessary to establish a claim for defamation.   To state a defamation claim, a plaintiff must allege facts establishing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages.   *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006).

¶ 90    McQueen argues that his statements are protected by the absolute privilege afforded to governmental officials.   Absolute immunity protects an executive official from defamation claims for statements made when the official "was acting within the scope of his official duties." *Blair v. Walker*, 64 Ill. 2d 1, 7 (1976).   Prosecutors have an absolute privilege to comment on issues within the scope of their employment.   *Ware v. Carey*, 75 Ill. App. 3d 906, 913 (1979) (holding that the State's Attorney was immune from a claim for defamation based on comments "arising from the performance of his duties").   Further, because a State's Attorney is the "leader of law enforcement in the community," commenting to the public on criminal cases is within the scope of his or her employment.   (Internal quotation marks omitted.)   *Id.* at 914.

¶ 91    In this case, Bianchi, Salgado, and McCleary alleged that, four days after they were indicted and arrested, McQueen made defamatory statements during a press conference, repeating the false and inflammatory allegations contained in the indictments and making an additional false and inflammatory statement.   The alleged additional statement that McQueen made was that a number of lawyers called McQueen and told him that cases handled by Bianchi "suggested that equal protection rights of all [criminal] defendants were not being upheld because of favoritism."   Plaintiffs have not alleged that McQueen made any defamatory statements unrelated to their indictments in this case.   Thus, plaintiffs have failed to allege facts that, if proven, would show that McQueen's statements were made outside the scope of his

official duties. Therefore, we affirm the trial court's dismissal of plaintiffs' defamation claim (count VIII).

¶ 92    Plaintiffs cite *Buckley* to support their argument that "a prosecutor who makes allegedly false statements during a public announcement of an indictment is not entitled to absolute immunity." In *Buckley,* the Supreme Court held that a prosecutor's "statements to the media are not entitled to absolute immunity." *Buckley*, 509 U.S. at 277. Unlike the present case, which involves a question of state tort law, *Buckley* involved an action brought under section 1983. *Id.* "Section 1983 on its face admits of no defense of official immunity." *Id.* at 268. In this case, plaintiffs were required to plead facts sufficient to establish that McQueen's statements were not privileged. See *Solaia Technology*, 221 Ill. 2d at 579. For this reason, *Buckley* is not applicable here.

¶ 93    Lastly, defendants argue that plaintiffs have failed to plead a cause of action for conspiracy. Plaintiffs respond that they alleged that defendants engaged in a "conspiracy" to fabricate evidence to cause the prosecution of plaintiffs. However, plaintiffs concede that they did not allege a separate cause of action for conspiracy. Therefore, we need not address defendants' argument.

¶ 94                                    III. CONCLUSION

¶ 95    Defendants are not entitled to sovereign immunity from plaintiffs' claims and plaintiffs pleaded sufficient facts to establish causes of action for malicious prosecution and intentional infliction of emotional distress. Therefore, we reverse the trial court's dismissal of counts I through VII. However, plaintiffs Bianchi, Salgado, and McCleary failed to plead sufficient facts to establish a cause of action for defamation against defendant McQueen. Therefore, we affirm the trial court's dismissal of count VIII.

¶ 96    We remand the case for further proceedings.

¶ 97    Reversed in part and affirmed in part; cause remanded.